W. E. BROWN v. E. E. DAIL et al.

*Sale of Contingent Interests—Chattel Mortgage, Validity of—Mortgage on Prospective Products—Registration—. Lien.*

1. Contingent rights are, as a rule, assignable in equity and a deed conveying the same, if executed fairly and for a sufficient consideration, will, upon the happening of the contingency and the vesting of the interest, be enforced in equity as a contract to convey.

2. A contract creating a lien upon the stock and prospective products of a business to secure capital for the operation of the business, is a valid chattel mortgage.

3. The fact that a lien is created on the entire stock and prospective products of a business in order to secure advancements for its conduct, does not raise a presumption of fraud either upon the ground that it is manifestly for the ease and comfort of the one conducting the business or that the terms of the contract are such as to call for explanation and throw upon one claiming under it the burden of rebutting the presumption that it is fraudulent.

4. Where parties engaged in saw-milling business executed a chattel mortgage upon all their stock on hand and upon their prospective stock and products in order to secure advancements for carrying on the business and the mortgage was duly recorded, logs sold to and coming in o possession of the mortgagors became subject to the lien of the mortgagee, as against the vendor, immediately upon delivery.

CIVIL ACTION, for the possession of personal property, tried before *Bryan, J.*, at the May Special Term, 1895, of CRAVEN Superior Court, upon exceptions filed by the defendant to the report of a referee.

The facts as found by the referee were that in February,

1893, James F. Heath, and others, entered into a contract with the plaintiff which, after setting out in the premises that the former, who were engaged in the business of cutting and sawing timber, had not the means necessary to carry on the business and had applied to the plaintiff for financial aid, and he agreed to make the advances if he should be fully secured, provided as follows:

"It is agreed by all the parties to this agreement that all the logs cut, all the lumber sawed, and every product of this business shall stand as security for all and any advancements made under this agreement; and when the lumber is sawed any sums received from the sale of the same at the mill shall be paid over to the party of the first part, and any shipment made of said lumber the bill of lading shall be made out in W. E. Brown's name, and the proceeds of the same shall come first to him. That from the moneys received by W. E. Brown from the sale of lumber shall be applied to the payment of any and all indebtedness to him due and owing by the parties of the second part and the parties of the third part for advancements made under this contract and agreement, and the balance, if any, shall be paid over to the said parties of the second and third part, as their respective interest may appear."

The referee further found that said contract was duly registered on May 3, 1893, and that the plaintiff performed his part of the contract; that said Heath and others, entered upon the lands of the defendant, E. E. Dail, under the lease of the timber rights, cut timber thereupon and failed to pay rents, until on the 12th September, 1893, in settlement for rent and timber up to that date, they sold to the defendant, E. E. Dail, all the lumber on the saw-mill yard, and on that day the said Dail took possession.

The referee found as conclusion of law that the said contract was a mortgage and after registration was notice to

the world of its conditions and covered property acquired, after its date, in the conduct of the business described in the contract; that the title to the lumber delivered to Dail under the sale of Sept. 12th, 1893, did not pass to him except subject to the lien of the mortgage to plaintiff.

The report and findings of the referee were sustained by the Court and the defendants appealed.

*Mr. O. H. Guion*, for plaintiff.
*Mr. W. W. Clark*, for defendants (appellants).

AVERY, J.: Under the rigid rule of the common law contingent interests might be released to the particular tenant or devised, or might pass to the heir or executor, but, according to Blackstone, could not "be assigned to a stranger unless coupled with some interest." 2 Bl., 290. But a different principle prevailed in Courts of Equity, and following the more liberal policy, which is better adapted to the state of society in this country, the Court has held that contingent rights are, as a rule, assignable in equity, and that a deed purporting to pass what one expects to inherit from a parent, and many other contingent rights, will, upon the happening of the contingency and the vesting of the interest, be enforced in equity as a contract to convey when it appears that the deed was executed fairly and for a sufficient consideration. *Foster* v. *Hackett*, 112 N. C., 546; *Watson* v. *Smith*, 110 N. C., 6; *Wright* v. *Brown*, 116 N. C., 26; *Taylor* v. *Smith*, *Ibid*, 531; *McDonald* v. *McDonald*, 5 Jones Eq., 211; *Mastin* v. *Marlow*, 65 N. C., 695; *Bodenhamer* v. *Welch*, 89 N. C., 78. The ancient prohibitory rule which declared deeds for pretended titles and for interests in lands adversely held, as well as conveyances of expectancies to strangers, inoperative and void, was founded upon the idea

that such contracts were in contravention of public policy. This Court was not governed, in *Loftin* v. *Hines*, 107 N. C., 361, by any such principle as was suggested on the argument, but justified the ruling upon the widely different and much more rational view of public policy, that in sustaining the validity of mortgages upon crops that might be made by the mortgagor for an indefinite future period, the courts would lend their sanction to contracts tending to "diminish production." In this case the agreement, by virtue of which the property is claimed, vested in the plaintiff in consideration of his stipulation to make advancements to defray the necessary, expenses in the prosecution of the saw-milling business, the title to "all the logs cut, all the timber sawed, and every. product of the business" if it was neither illegal nor fraudulent. The defendant attempts to impeach the instrument upon two totally incongruous grounds. He contends first, that it should be held void as against public policy because it tends to oppress the defendants who were engaged in running the mill, and destroy production in the line in which they were engaged, and for the further reason that it is the duty of the Court to hold that the agreement is either upon its face void, because by its terms manifestly made for the ease and comfort of the men engaged in the milling business, or, if that is not true, that the terms of the instrument are such at least as to call for explanation and throw upon the plaintiff, claiming under it, the burden of rebutting the presumption that it is fraudulent. The six exceptions to the referee's report, which were overruled by the Court, raise the question whether either of these contentions should be sustained.

As between the original contracting parties we think the agreement is neither void nor presumptively fraudulent. The authorities cited show that the agreement was

BROWN v. DAIL.

not void because it purported to pass the equitable right to personal property, which at the time had no potential existence. There is no apparent danger of destroying the business of the mortgagors, if we hold that the paper must be construed as creating a lien from its registration, since the plaintiff, as a security for the money advanced to buy, cut, deliver and saw logs, acquired a lien upon the logs and the product of the mill, with the power in the defendants to sell at the mill and pay over the proceeds of sale to the plaintiff Brown, or to ship to other markets in the name of Brown as consignor. A contract of this kind to operate indefinitely on the capital of another, conduct the sales of the product of the business and pay over the proceeds, but to hold both raw material and the finished or converted article in trust to secure the payment of the fund advanced, is not of the kind that either destroys industries or oppresses those conducting them. The parties engaged in the milling business were allowed to make an experiment on the most favorable terms to ascertain whether it is true that mathematical calculations may be relied on to ascertain in advance the probable profits of any other business but that figures will fail to bring correct results when applied to the prospective operation of a saw mill. From bad management or some other cause the business did not prosper, and thereupon a lot of logs which had been delivered unconditionally so as to vest the title to them first in the defendants and then subject them to the lien, if any was created by the agreement, were turned over to the brother of one of the defendants who had furnished them. The brother (E. E. Dail) had no longer any title to or lien upon the logs. If the agreement created a lien as between the parties to it upon all logs delivered at the mill, it would follow, upon the authority of adjudications in this Court and elsewhere, that the

defendant E. E. Dail had constructive notice of its terms and its legal effect, because upon a well established principle he could have no better title than his vendor. Jones Ch. Mort., Section 156.

If the defendant by the terms of the agreement held the proceeds of sale of the lumber and logs in trust to secure the payment of the money advanced, it would seem manifest he is in the condition that a person always occupies who takes property, which he knows is held in trust, in payment of a debt due him from the trustee in his individual capacity. If E. E. Dail had taken a horse which had been subjected to the lien of a chattel mortgage by those who were operating the saw-mill, to secure a debt due to the plaintiff, clearly the title would not have passed in the face of the registered assignment. If the title to the logs passed by delivery to those operating the mill, as it unquestionably did by the delivery, and the mortgage was not void as contrary to public policy, then they became subject to the lien immediately on delivery. We think the agreement must be construed according to the manifest intent of the parties as a chattel mortgage. No particular form is essential, and the instrument has all of the constituents necessary to create a chattel mortgage. The intention of the parties that the property to be thereafter acquired should be held in trust for the benefit of the plaintiff and that the proceeds of sale of it should be paid over to him, is plainly expressed, and the instrument must therefore be construed as a chattel mortgage, subject to lien laws and other statutes subject to such contracts, Jones Chattel Mort., 275. If not coming within the particular rule applicable to crops, it falls within the general doctrine governing chattels having no potential existence or so subsequently acquired, Jones Chattel Mort., 270a, 40 Am. Dec., 717 note, 71 Am. Dec., p. 730.

The case at bar differs from Cheatham v. Hawkins, 76 N. C., 335, in that the advancements under the contract were made, not to help one who had become embarrassed to pay off pressing claims and weather the storm, but to start a new business, as all of the parties to it doubtless thought with the prospect of profit to those operating the mill and of reimbursement of advancements with interest to the plaintiff.  This case it seems to us falls within the reasons given by the Court for sustaining a mortgage upon a stock of goods made to secure the notes executed for the purchase price in Kreth v. Rogers, 101 N. C., 263.  No presumption of fraud arises where a lien is created, as in this instance, to start a new industry by furnishing the necessary capital to operate the business.  Men who lend financial aid to start such enterprises are often public benefactors, and should not be subjected to the suspicion that overhangs those who help to cover up and put beyond the reach of creditors the assets of a failing person or partnership business.

For the reasons given we think there is no error.

No Error.