## BOLES v. CAUDLE.

(Filed November 24, 1903.)

1. SPECIFIC PERFORMANCE—*Contracts—Non-suit—Equity—Const. N. C., Art. 4, sec. 1.*

   In an action for the specific performance of a contract, the court cannot non-suit the plaintiff, unless, admitting the evidence to be true, with all inferences favorable to plaintiff, he is not entitled to relief.

2. SPECIFIC PERFORMANCE—*Contracts—Questions for Jury—Questions for Court.*

   In an action for the specific performance of a contract, controverted facts should be submitted to the jury, but the trial judge, on the admitted facts and those found by the jury, should decide whether the plaintiff is entitled to the equitable relief demanded.

3. SPECIFIC PERFORMANCE—*Contracts—Undue Influence.*

   Where a contract to convey an interest in property is based on a fair consideration, is not procured by undue influence, its enforcement will not be oppressive and it has been partially performed, its specific performance will be decreed.

ACTION by J. W. Boles against N. L. Caudle, heard by Judge *T. J. Shaw* and a jury, at Fall Term, 1903, of the Superior Court of STOKES County. From a judgment for the plaintiff the defendant appealed.

*Carter & Lewellyn* and *Watson, Buxton & Watson,* for the plaintiff.

*W. W. King,* for the defendant.

CONNOR, J. The defendant N. L. Caudle, on the 9th day of June, 1888, in consideration of one hundred and fifty dollars to be paid to her in eight annual instalments, executed a paper-writing purporting to convey, assign and transfer to

the plaintiff all the right, title and interest which she then had or should thereafter have in the property and estate of her grandfather, George H. Crouse. Thereafter the said George H. Crouse died leaving a will executed February 2, 1898, giving to the defendant an interest in his estate, the value of which is in excess of the amount paid her by the plaintiff. The plaintiff asserted legal title to the interest of the defendant in said estate. The effect of said paper-writing in that respect was passed upon by this Court at the February Term, 1900, 126 N. C., 352, when *Furches, J.,* said: "The most that it could amount to would be an executory contract to convey. But this not being a contract to convey specific property, the question will be whether a Court can or will compel a specific performance; whether it could amount to more than a breach of contract, which would sound in damages, if it is such a contract as can be enforced." The judgment of the Court below declaring the plaintiff to be the owner of the defendant's interest in the estate of the grandfather was reversed by this Court, and a new trial awarded. The plaintiff thereupon amended his complaint and demanded specific performance of the contract. The defendant filed an amended answer, alleging "that if she executed the contract it was procured by undue influence, ignorance of its effect, advantage taken of her ignorance, weak and afflicted condition, necessity and poverty, and that said contract is unfair, harsh, unjust and oppressive, and without fair and adequate consideration."

When the cause came on for trial upon the amended pleadings, the plaintiff introduced the paper-writing dated June 9, 1888, proven and recorded April 4, 1899. It recorded a consideration of $150, and contained appropriate words of conveyance and assignment of "all and every part of her claim to all real and personal property, which she is, or may hereafter own in Henry Crouse's estate, as the granddaughter

of said Henry Crouse, of Solomon Crouse's estate," etc. Plaintiff then offered in evidence the will of said Crouse, dated February 2, 1898. The only portion material to this appeal is a gift of his son Solomon's part of the estate to his children, giving two daughters $100 each, with the provision that "N. L. Caudle is to have the remainder of my son Solomon's part of my estate and J. W. Boles has bought her interest in my estate."

The plaintiff testified that he married the daughter of George H. Crouse. There were seven children. Solomon was killed in the army, leaving three children. George H. Crouse died August 1, 1899. He saw defendant at the Crouse home during the spring of 1888. While he was at the wood-pile defendant came to him and proposed to sell her interest in her grandfather's estate. Witness told her that he would "study about it." She insisted, and said she would take $150. That she did not want it all at once; that it could be paid in small payments. That she and her grandfather had been talking about it. Witness did not buy it then. In about three months George H. Crouse came to his house and said that at request of defendant he had tried to sell her interest to Wesley Crouse; that he would not buy and she had got him to come to see witness. Crouse said that he would see that witness did not lose anything by it; that he would fix it in his will. Crouse told witness that he did not know the worth of the estate. He said that defendant was going home in a few days and wanted the paper fixed up. Crouse had the paper written and had defendant to sign it. Witness gave him notes for the $150. That he has paid all of the notes except the last, for which the defendant refused to accept money. At the time of the purchase witness thought that there was but little profit in it. Defendant told witness that she was glad he had bought. She went blind some time after the sale. She said six years after the sale that she was

glad she had sold; that the money came in good time. Witness was not present at the time the paper was signed. The value of Crouse's estate increased very much after sale by defendant. Witness paid interest on the notes. It appeared from tax lists that Crouse listed, in 1888, $2,176 worth of property; in 1899, $4,391.

Defendant testified that she was thirty-nine years old; that she was one year old when her father was killed; that her husband died fourteen years ago and she went to her grandfather's for the first time in sixteen years, and while at her grandfather's he said that he had tried to sell one-third of what was coming to her father for $150, and thought it best to sell, as the witness had two small children; her health was bad and she went blind in July; that she had never seen the plaintiff, and she had to do what her grandfather said; that he said the plaintiff had bought her interest in the estate, and Wesley carried her to Butner's and she signed the paper, and they paid her $12.50. She did not know the contents of it, and thought it was for Boles to have $150 out of her father's estate; that was what her grandfather told her. In a short time afterwards the plaintiff paid another note; he sent her two payments during two years, and her grandfather wrote her that the plaintiff was shaving his notes; he shaved six notes and paid others in full; she stayed at her grandfather's nine years and went to see the plaintiff once during that time. The witness denied the conversation with the plaintiff. Her grandfather paid her the notes. After her grandfather died, Key, the plaintiff's son, brought her $25 and said that counsel said it was best for her to take it. At the time she executed the paper her financial condition was bad. Had no real estate or any other property. The defendant showed value of Crouse's estate. Plaintiff introduced other testimony tending to corroborate his own. The executor testified that Solomon's share was worth $1,173, and he owed the

estate $835. He agreed to knock off interest, which would leave $500. There is some confusion in the testimony in regard to the exact value of the share coming to defendant. The foregoing is substantially the testimony. The defendant requested the Court, upon the entire evidence, to non-suit the plaintiff. This was refused and defendant excepted. His Honor submitted issues to the jury to which they responded as follows:

1. Did the defendant N. L. Caudle execute the paper-writing set out in the complaint? Answer, Yes.

2. Was the execution of said paper-writing procured by the undue influence of George H. Crouse or any other person? Answer, No.

3. Was the consideration of said paper-writing a fair consideration for N. L. Caudle's interest in her grandfather's estate at, the time of the execution of said paper-writing? Answer, Yes.

4. Would the specific performance of said contract be oppressive? Answer, No.

5. Did the plaintiff perform his part of said contract as alleged? Answer, Yes, all but $25.

6. Is the plaintiff ready, able and willing to carry out his part of said contract? Answer, Yes.

There was no exception to any part of the charge.

The only question thus presented for review is whether upon the whole evidence the Court should have decreed specific performance of the contract. The plaintiff, prior to the adoption of the Constitution of 1868 and The Code of Civil Procedure, would have filed a bill in the court of equity, asking for a decree enforcing specific performance of what the Court has declared to be an executory contract. The cause would have been heard upon depositions and the Chancellor would, in the exercise of a sound judicial discretion, have made a decree. By our Constitution, Article XV, section 1,

all distinctions between actions at law and suits in equity are abolished, and but one form of action is provided. "The remedy for the enforcement of all kinds of contracts" is now a civil action. *Mitchell v. Henderson*, 63 N. C., 643.

This change in the law of procedure, it is said by this Court in a number of cases, does not destroy or merge legal and equitable rights, but as all controversies at law are to be tried by the ancient mode of trial by jury, it has been uniformly held that issues of fact raised by pleadings in actions for the enforcement of equitable rights must be tried by the jury unless waived. *Dillard, J.*, in *Chasteen v. Martin*, 81 N. C., 51, says: "But under the Constitution and The Code all distinctions between actions at law and suits in equity being abolished, and there being now but one form of action, the Judge does not now try and pass on facts put in issue on the pleadings. It is the constitutional right of the parties, as well as the statutory provision, that such issue shall be passed upon by a jury except upon waiver." *Ely v. Early*, 94 N. C., 1. The Court should not, therefore, take the case from the jury and non-suit the plaintiff, as requested by the defendant, unless he could maintain the proposition that, admitting the entire evidence to be true, with all inferences to be drawn from them most favorable to the plaintiff, he was not entitled to relief. The defendant's counsel in an excellent brief and argument made before us contends that such is the law. He cited a number of authorities sustaining his position that specific performance is not a matter of right, but rests in the sound judicial discretion of the Court. The reported cases, English and American, fully sustain this principle. This Court has frequently announced and been guided by this doctrine of equity. In *Leigh v. Crump*, 36 N. C., 299, *Gaston, J.*, says: "The specific performance of a contract in equity is a matter not of absolute right in the party, but of sound discretion in the Court. Although it be valid at law, and, if it

had been executed by the parties, could not be set aside because of any vice in its nature, yet if its strict performance be under the circumstances hard and inequitable a court of equity will not decree such performance, but leave the party claiming it to his legal remedy." While this is true, it is equally true that "when the contract is in writing, is certain in its terms, is for a valuable consideration, is fair and just in all its provisions, and is capable of being enforced without hardship to either party, it is as much a matter of course for a court of equity to decree its specific performance as it is for a court of law to award damages for its breach." Pomeroy Eq., sec. 404. The question is ably discussed and the authorities reviewed in *Semour v. Delancy,* 3 Cowan, 445; 15 Am. Dec., 270. The note to this case contains a full and exhaustive history of the doctrine of specific performance as applied by Chancellors in England and in this country. That a court of equity will specifically enforce a contract to sell and convey an expectancy, as the interest which a child or grandchild may have in the estate of his ancestor, is settled by the decisions of this Court. *Battle, J.,* in *McDonald v. McDonald,* 58 N. C., 211, 75 Am. Dec., 434, in speaking of a contract of this character, says: "It follows that he did not have anything which he could assign or transfer to another either at law or in equity. But he had right to make a contract to convey whatever interest he might in future have in his cousin's property, and such contract, when finally made upon a valuable consideration, the court of chancery will enforce whenever the property shall come into his possession." See also *Mastin v. Marlow,* 65 N. C., 703; *Tucker v. Markland,* 101 N. C., 427; *Foster v. Hackett,* 112 N. C., 556; *Wright v. Brown,* 116 N. C., 28; *Brown v. Dail,* 117 N. C., 41. The jury having found upon competent evidence that the contract was upon a fair consideration and was not procured by any undue influence, that the plaintiff had performed his part

thereof and that its specific performance would not be oppressive, it would seem, that the conscience of the Court, thus enlightened, would find no difficulty in granting the plaintiff a decree. We do not intend to hold that, notwithstanding the finding of the jury, the Court under our judicial system was compelled to grant specific performance if it was harsh, oppressive or inequitable. This would be to surrender to the jury a most important function and duty of the Judge. It is not clear that the fourth issue should have been submitted to the jury. They may, upon issues properly framed, inform the Court in respect to the controverted matters of fact, but it is the duty and right of the Court to say, upon the admitted facts and those found by the jury, whether in the exercise of a sound judicial discretion the plaintiff is entitled to the relief sought. It cannot be that the change in the procedure wrought a destruction of the principles of equity jurisprudence built up by the great Chancellors of England and this country. After a careful review of the evidence, we think that the verdict of the jury is in accordance with the truth of the controversy, and that there is no good reason why the judgment rendered should not be sustained. We could not, in view of the fact that the plaintiff has paid all of the purchase money except $25, which he has tendered and is ready to pay, refuse him any relief in equity and leave him to an action at law for breach of the executory contract, when it is apparent that the defendant is insolvent. It is evident that to compel the defendant to repay the money with interest would leave her but a small pittance, and be of little real value to her. The grandfather, who seems to have had the best interests of the defendant in mind, knew best what her probable interest in his estate would be worth, and advised making the sale for $150. We cannot see that as matters then stood the amount was not a fair consideration. There is no evidence of any influence whatever exerted by the plaintiff upon the defendant. He

seems to have been urged to make the purchase by the grand-father. While we would not hesitate to hold the plaintiff to strict proof of the facts upon which his claim to relief is based, and refuse relief where it was reasonably doubtful whether, in accordance with the principles of equity, he was entitled thereto, we cannot so far interfere with the freedom of contract as to hold that in a case like this he is not entitled to relief.

Contracts for the sale of expectancies and drafts upon the future are not favorites of courts of equity, and will be sustained only when shown by those claiming under them that they are entirely fair and free from any vitiating element. Children should not be encouraged to spend their inheritance in advance, or to speculate upon the death of their fathers. It may be that in these days the evil effects of living upon the future demand a stricter investigation by the Courts of contracts of this character. In addition to the evil effect upon the habits and mode of life of the people, such contracts are calculated to weaken the bonds of affection and degrade the most sacred relations of life to a mere pecuniary basis.

We sustain this judgment upon the finding of the jury and the facts in this case, without intending to depart in the slightest degree from the principles by which courts of equity have always been guided in such cases. We have not over-looked the exception to the refusal to submit issues tendered by the defendant. We think those submitted presented every phase of the controversy.

Judgment affirmed.