Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consolidated, 2003 NCBC 3

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| COUNTY OF DURHAM | SUPERIOR COURT DIVISION<br>99 CVS 2459 |

DURHAM COCA-COLA BOTTLING COMPANY, )

        Plaintiff, )

    vs. )

COCA-COLA BOTTLING CO. )   **OPINION AND ORDER ON**
CONSOLIDATED, REIDSVILLE )   **SUMMARY JUDGMENT**
TRANSACTION CORPORATION, INC., )
REIDSVILLE COCA-COLA BOTTLING )
CO., R. S. FISH, Trustee, )
U/W D. D. BUSICK, FRED D. BUSICK, )
JOHN O. BUSICK, II, WILLIAM E. )
BUSICK, BRONA B. FISH, and )
KATHRYN B. McMICHAEL, )

        Defendants. )

{1}     THIS MATTER was heard before the undersigned on December 19, 2002 on: (1) the summary judgment motion of Defendants Coca-Cola Bottling Co. Consolidated ("Consolidated") and Reidsville Transaction Corporation, Inc. ("RTCI"); (2) the summary judgment motion of Defendant Reidsville Coca-Cola Bottling Co. ("Reidsville") and Defendants R.S. Fish (Trustee Under Will of D.D. Busick), Fred D. Busick, John O. Busick, II, William E. Busick, Brona B. Fish, and Kathryn B. McMichael (collectively "Individual Defendants"); and (3) the partial summary judgment motion of Plaintiff Durham Coca-Cola Bottling Company ("Durham").

{2}     This litigation arose out of events surrounding the sale of Defendant Reidsville after receipt of competing offers to purchase from Defendant Consolidated and Plaintiff Durham. A resolution of each of the claims in this matter necessarily depends on a determination of whether Durham's February 26, 1999 letter of intent created a valid or enforceable contract. In reaching its decision, the Court considered: (1) plaintiff's partial summary judgment motion, Defendants Consolidated and RTCI's response, and plaintiff's reply in support; (2) Defendants Consolidated and RTCI's summary judgment motion, plaintiff's response, and Defendants' reply in support; (3) Defendant Reidsville and Individual Defendants' summary judgment motion, plaintiff's response, and Defendants' reply in

support; and (4) oral argument held on December 19, 2002.

{3}     The Court finds that Durham's February 26, 1999 letter of intent was not a valid or enforceable contract and consequently GRANTS the summary judgment motions of the Individual Defendants, Reidsville, Consolidated, and RTCI. The Court DENIES plaintiff's partial summary judgment motion. As a result of this holding, the Court GRANTS Defendants Consolidated and RTCI's motion to dissolve the preliminary injunction entered in this action against Consolidated and RTCI on July 7, 1999.

*Moore & Van Allen, PLLC, by Kevin M. Capalbo, Lewis Cheek and Michael J. Byrne, for Plaintiff Durham Coca-Cola Bottling Company.*

*Kennedy, Covington, Lobdell & Hickman, LLP, by Kiran H. Mehta and Samuel T. Reaves, for Defendants Coca-Cola Bottling Co. Consolidated and Reidsville Transaction Corporation, Inc.*

*Haywood, Denny & Miller, L.L.P., by George W. Miller, Jr., for Defendants Coca-Cola Bottling Co. Consolidated and Reidsville Transaction Corporation, Inc.*

*Wishart, Norris, Henninger, & Pittman, P.A., by Brian P. Gavigan, for Defendants Reidsville Coca-Cola Bottling Co., R.W. Fish (Trustee U/W D.D. Busick), Fred D. Busick, John O. Busick, II, William E. Busick, Brona B. Fish, and Kathryn B. McMichael.*

## I.

## BACKGROUND

### The Parties

{4}     Realizing that there are no material facts in dispute, all parties have moved for summary judgment. Consolidated and Durham are franchised carbonated beverage bottlers and distributors whose primary business is bottling and/or distribution of Coca-Cola brand carbonated beverages within defined territories. Reidsville was in the same business before its acquisition by RTCI on May 16, 1999. Reidsville had an exclusive sales territory including the town of Reidsville, North Carolina and an area surrounding Reidsville. The Individual Defendants were Reidsville's directors, as well as Reidsville's only shareholders. They are all related.

{5}     On February 24, 1999, Consolidated presented Reidsville with a letter of intent for the purchase of Reidsville for $4.1 million ("Consolidated Proposal"). Two days later, Durham sent a letter of intent for the purchase of Reidsville for $4.5 million ("Durham Proposal"). Consolidated eventually acquired Reidsville through its subsidiary RTCI for $5.1 million.

{6}     Consolidated is a "first line" bottler, and, prior to May 16, 1999, Reidsville was a "sub-bottler" operating under a contract with Consolidated. Pursuant to a sub-bottler's contract dated June 30, 1949 ("Sub-Bottler's Contract"), Consolidated was the source of Reidsville's rights with respect to Coca-Cola brand products in Reidsville's territory. The Coca-Cola Company granted Greensboro Bottling

Co. ("Greensboro"), a predecessor of Consolidated, the first-line bottling rights for the bottling and distribution of Coca-Cola products in the Reidsville territory. Greensboro transferred those bottling rights to Reidsville under the Sub-Bottler's Contract. Article 9 of the Sub-Bottler's Contract provided that "this contract shall not be assigned, transferred or conveyed, in whole or in part, without the written consent of [Consolidated], The Coca-Cola Bottling Company [now Coca-Cola Company USA], and The Coca-Cola Company."

{7}     The universe of bottling territories is shrinking, making the opportunity to purchase territorial bottling rights valuable and unique. This is particularly true where the territory is adjacent to or near the purchaser's existing territory.

## Procedural History

{8}     On April 13, 1999, Durham filed an action in Durham County (Civil Action No. 99 CVS 1591) seeking specific performance of an allegedly binding contract between Durham and Reidsville, claiming breach of the alleged contract by Reidsville, and seeking injunctive relief to prevent Reidsville from selling or disposing of its assets; the action was voluntarily dismissed without prejudice.

{9}     In an effort to enforce its purported rights under a February 24, 1999 letter of intent, Consolidated filed a declaratory judgment action in Superior Court for Mecklenburg County (Civil Action No. 99 CVS 6062) on April 19, 1999. This suit was ultimately resolved when Reidsville sold substantially all of its operating assets to RTCI, a subsidiary of Consolidated, on May 16, 1999.

{10}    On May 28, 1999, Durham commenced the present action by filing a verified complaint, motion for temporary restraining order, and motion for preliminary injunction in the Superior Court for Durham County. In its complaint, Durham sought (1) specific performance of the terms of the February 26 Durham Proposal, (2) damages from Consolidated and RTCI for tortious interference and unfair trade practice, (3) damages for breach of contract from Reidsville and its shareholders, (4) a temporary restraining order and preliminary injunction preventing Reidsville and its shareholders from disposing of Reidsville's stock or assets or disposing of any funds received from any sale of assets, and (5) a temporary restraining order and preliminary injunction preventing RTCI and Consolidated from disposing of the assets received from Reidsville. The presiding judge, Orlando F. Hudson, Jr., entered a temporary restraining order in favor of Durham on the same day; on July 7, 1999, Judge Hudson entered a preliminary injunction that requires Consolidated and RTCI to maintain the separateness of

Reidsville's assets and to refrain from transferring those assets pending the outcome of this case. Judge Hudson made no findings as to the likelihood of success on the merits.

{11}     In the consolidated appeals of 99 CVS 6062 and 99 CVS 2459, the North Carolina Court of Appeals affirmed the preliminary injunction entered in 99 CVS 2459 and reversed the motion to dismiss granted in favor of Durham in 99 CVS 6062, finding that Durham was the "natural plaintiff." *Coca-Cola Bottling Co. Consolidated v. Durham Coca-Cola Bottling Co.*, 141 NC App 569, 541 S.E.2d 157, *review denied*, 353 NC 370, 547 S.E.2d 157 (2001).

{12}     The case was subsequently assigned to the Business Court by Order dated August 13, 2001. Discovery has been completed, and the matter is now before the Court on these pending motions.

**Facts**

{13}    Sometime during the 1997-1998 time period, Reidsville's Board of Directors had discussed selling the company. At that time, there was internal dissension within the Board over the operation of the business as well as the possibility of a labor union organizing effort.

{14}    At the urging of Reidsville President Fred D. Busick ("Busick"), Reidsville hired George Overend ("Overend") of Overend & Company, Inc. to "act as a broker for Reidsville in selling its business" in October 1998. In January 1999, Overend contacted Robert D. Pettus ("Pettus"), executive vice-president and assistant to the chairman of Consolidated. Pettus responded affirmatively when Overend asked him if Consolidated wanted to make an offer for Reidsville. Overend subsequently sent a handwritten memo and information packet regarding Reidsville to Consolidated's vice-president, Umesh Kasbekar. On February 3, 1999, Pettus mailed a letter to Overend with an enclosed term sheet for Consolidated's purchase of Reidsville for a base purchase price of $4.1 million.

{15}     Consolidated presented its proposal to Reidsville at a February 24, 1999 meeting that included Overend, Pettus, Consolidated's Chairman and Chief Executive Officer J. Frank Harrison, III ("Harrison"), and all Reidsville shareholders and directors. The majority of the Reidsville shareholders voted in favor of accepting the Consolidated Proposal.[1]

{16}    Busick was the only director/shareholder that did not sign the acceptance page of the Consolidated Proposal. He told Consolidated that they "were in agreement" and that he would sign and deliver the Proposal to Consolidated in Charlotte the following Monday, March 1, 1999. He had no such intention.

{17}     Busick had been conducting his own negotiations with Durham without the knowledge of the remaining Reidsville Board members, and he never intended to agree to the Consolidated Proposal. In early February 1999, Busick had met with Durham's president, Hagar Rand ("Rand"), and discussed

Reidsville's assets, marketing strategy, a "little bit" about their relationship with The Coca-Cola Company, and a "little bit" about Busick's relationship with the Board. Based in part on this meeting, Mike Estep, Durham's chief financial officer, created a pro forma earnings statement in preparation for making an offer for Reidsville. Rand followed up on this meeting by sending a letter to Busick on February 16, 1999 regarding the potential purchase of Reidsville for $3,340,000. Rand requested that Reidsville give Durham the "opportunity to submit a formal offer to purchase prior to Reidsville's acceptance of any competing offer."

{18}     Sometime between the February 24 meeting with Consolidated and February 26, 1999, Busick contacted Rand to tell him about the Consolidated Proposal. He then faxed a copy of the Consolidated Proposal signature page showing he had not signed it. On February 26, 1999, Durham sent Reidsville a letter of intent ("Durham Proposal") for the purchase of Reidsville for $4.5 million. [2] All of Reidsville's shareholders and directors, including Busick, signed the Durham Proposal sometime during March 1-3, 1999.

{19}     Busick personally delivered the signed proposal to Rand on March 3, 1999. One of the assumptions upon which the Durham Proposal was based was that "[n]o third party approvals will be required to consummate the sale; or, if any such third party approvals are required, all of such approvals will be provided without restriction prior to closing." (Durham Proposal Para. 3.) As discussed above, Reidsville, pursuant to its 1949 Sub-Bottler's Contract, was required to obtain the written consent of Consolidated, Coca-Cola Company USA ("Coke USA") and The Coca-Cola Company. While Busick was at Rand's offices, Reich Welborn ("Welborn"), Durham's counsel, drafted correspondence on behalf of Reidsville for Busick's signature requesting the approval of Consolidated, Coke USA, and The Coca-Cola Company of the transfer and assignment of the Sub-Bottler's Contract. The letter was sent to Harrison and W. Thomas Haynes ("Haynes"), legal counsel for The Coca-Cola Company.

{20}     Haynes responded to Busick on March 5, 1999, acknowledging receipt of Busick's March 3 letter and noting the possibility of an existing right of first refusal in favor of Consolidated. (Busick Dep. Ex. 6.) Reidsville granted that right of first refusal in connection with obtaining first line bottler's rights. While The Coca-Cola Company subsequently advised that it understood that there was some uncertainty about the right of first refusal, it made clear that, based on its "inherent right as owner of the trademark to have a voice in any change of ownership or control," its consent was required regardless of whether Durham structured the arrangement as an asset purchase or a stock sale. (Busick

Dep. Ex. 11.)

{21}    After learning of these negotiations, Pettus wrote two letters. The first letter advised Busick that Pettus had been forwarded a copy of Busick's March 3 letter seeking the consent of Consolidated to Reidsville's sale of assets to Durham. Consolidated indicated that it would respond to Reidsville's request for consent to the sale to Durham after it had finished "reviewing all of its options ..., including its rights under the right of first refusal agreement Reidsville and Consolidated previously executed, and its rights under existing contractual arrangements between our companies." (Busick Dep. Ex. 7.) The second letter was a revised letter of intent to Reidsville's Board and shareholders offering to purchase Reidsville's assets for $5.1 million. Consolidated's letter indicated that it was made with the intention of closing quickly on the transaction and "in the interest of avoiding any dispute with Reidsville over our existing purchase agreement, our existing right of first refusal and our consent to transfer of the bottling rights." (Busick Dep. Ex. 8.)

{22}    On March 16 and 17, 1999, Reidsville's counsel, Dorn C. Pittman ("Pittman"), contacted Durham's counsel, Welborn, to discuss reopening negotiations and the possibility of having Consolidated and Durham enter into a bidding process. Additionally, Pittman sought to attempt to "determine [Durham's] level of interest in an attempt to settle disputes between numerous parties." (Busick Dep. Ex. 10.) Welborn responded by indicating that Durham expected Reidsville to proceed with an asset purchase based on the February 26 letter of intent or, if third-party consents were not "immediately forthcoming," then to proceed with a stock purchase agreement. (Busick Dep. Ex. 9.)

{23}    On March 22, 1999, Durham pressed forward by sending Reidsville a draft stock purchase agreement that was approximately 40 pages long. (Busick Dep. Ex. 12.) Durham contends that it intended the draft Stock Purchase Agreement to constitute the "definitive acquisition agreement" referred to in Paragraph 9 of the Durham Proposal. Reidsville did not respond to the draft stock purchase agreement until March 30, 1999, at which time Pittman indicated that that the Durham Proposal did not constitute a binding agreement and that it would not engage in further negotiations with Durham. (Busick Dep. Ex. 17.)

{24}    In April 1999, both Durham and Consolidated sued Reidsville. Durham seeks relief under the following causes of action: (1) specific performance of the February 26, 1999 letter of intent against all defendants, (2) tortious interference with contract against Consolidated and RTCI, (3) unfair trade practices against Consolidated and RTCI, and (4) breach of contract against Reidsville and the Individual Defendants. Reidsville ultimately resolved Consolidated's claim by selling substantially all of its assets to RTCI on May 16, 1999.

## II.

### SUMMARY JUDGMENT STANDARD

{25}    Pursuant to Rule 56(c) of the North Carolina Rules of Civil Procedure, summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law.  *See* N.C. R.  CIV. P.  56(c); *see also Beam v. Kerlee*, 120 N.C. App. 203, 209, 461 S.E.2d 911, 916 (1995)  (recognizing that summary judgment is appropriate only when "there is no dispute as to any material fact").  As moving parties, defendants have "the burden of showing there is no triable issue of material fact."  *Farrelly v. Hamilton Square*, 119 N.C. App. 541, 543, 459 S.E.2d 23, 25-26 (1995); *see Taylor v. Ashburn*, 112 N.C. App. 604, 606, 436 S.E.2d 276, 278 (1993).  In determining whether that burden has been met, the court "must view all the evidence in the light most favorable to the non-moving party, accepting all its asserted facts as true, and drawing all reasonable inferences in its favor."  *Lilley v. Blue Ridge Elec. Membership Corp.*, 133 N.C. App. 256, 258, 515 S.E.2d 483, 485 (1999); *see Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 472 S.E.2d 358, 362 (1996).

{26}    Once the moving party shows that the plaintiff is unable to prove an essential element in the plaintiff's case, the burden shifts to the plaintiff to make a contrary showing.  *Roumillat v. Simplistic Enterprises, Inc.*, 331 N.C. 57, 63, 414 S.E.2d 339, 341 (1992).  To defeat a motion for summary judgment, the non-moving party may not rely on the mere allegations in the pleadings.  *Nicholson v. County of Onslow*, 116 N.C. App. 439, 441, 448 S.E.2d 140, 141 (1998).  A response must describe specific facts showing that a genuine issue of fact exists for the trial.  *Culler v. Hamlett*, 148 N.C. 389, 392, 559 S.E.2d 192, 194 (2002).  If the plaintiff fails to make this contrary showing, the defendant is entitled to summary judgment.  *Id.* at 392, 559 S.E.2d at 194.

## III.

### IS THE DURHAM PROPOSAL A VALID AND ENFORCEABLE CONTRACT?

{27}    On October 11, 2002, Defendants Consolidated & RTCI filed a summary judgment motion asserting that the Durham Proposal was an invalid and unenforceable preliminary agreement.  These defendants further contend that if the Court were to find the Durham Proposal to be a valid contract, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show: (1) the Consolidated Proposal is a prior-in-time valid contract; (2) Durham would not be entitled to specific performance because money damages are adequate and specific performance would be inequitable; (3) Defendants cannot be liable for tortious interference because they were

justified in proceeding with the transaction; and (4) Defendants have not engaged in unfair trade practices.

{28}     Defendants Reidsville and the Individual Defendants filed for summary judgment on October 14, 2002, asserting that the affidavits filed in this case show the Durham Proposal was not an enforceable agreement, and therefore these defendants cannot be liable for specific performance or breach of contract.

{29}     Plaintiff Durham filed a motion for partial summary judgment on October 15, 2002, asserting that the Durham Proposal was a binding and enforceable contract to purchase the stock or assets of Reidsville.

{30}     Resolution of these motions necessarily turns on a determination of whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits filed in this case, are sufficient to show that the Durham Proposal either was or was not a valid or enforceable contract. The Court finds that the record in this case is sufficient to determine the validity of the contract as a matter of law and that the Durham Proposal was not a valid or enforceable contract.

{31}     The elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms. *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980) ("The essence of any contract is the mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds."); *Cap Care Group, Inc. v. McDonald,* 149 N.C. App. 817, 822, 561 S.E.2d 578, 582 (2002) ("An enforceable agreement requires an offer, acceptance and consideration."). "Generally, a party seeking to enforce a contract has the burden of proving the essential elements of a valid contract [.]" *Orthodontic Ctrs. of Am., Inc. v. Hanachi*, 151 N.C. App. 133, 135, 564 S.E.2d 573, 575 (2002) (citing *Neugent v. Beroth Oil Co*, 149 N.C. App. 38, 560 S.E.2d 829 (2002), *disc. rev. denied* 2003 N.C. LEXIS 99 (N.C. Feb. 27, 2003)).

{32}     "The heart of a contract is the intention of the parties, which is ascertained by the subject matter of the contract, the language used, the purpose sought, and the situation of the parties at the time." *Pike v. Wachovia Bank & Trust Co.,* 274 N.C. 1, 11, 161 S.E.2d 453, 462 (1968) (citing *Sell v. Hotchkiss*, 264 N.C. 185, 141 S.E. 2d 259 (1965); *Bank v. Courtesy Motors*, 250 N.C. 466, 109 S.E. 2d 189 (1959); 2 N. C. Index 2d, Contracts § 12, p. 315). "There must be a meeting of the minds so that the parties assent to the same thing in the same sense." *Id.* (citing *Sprinkle v. Ponder*, 233 N.C. 312, 64 S.E. 2d 171 (1951)); *see also Northington v. Michelotti,* 121 N.C. App. 180, 184, 464 S.E.2d 711, 714 (1995) ("It is a well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds to all essential terms of the agreement.") (citing *O'Grady v. Bank,* 296

N.C. 212, 221, 250 S.E2d 587, 594 (1978); *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974)).

{33}     In addition to the language chosen by the parties, a court may examine the subsequent behavior of the parties to determine whether a contract was made. *See Industrial & Textile Piping, Inc. v. Industrial Rigging Servs., Inc.,* 69 N.C. App. 511, 513-14, 317 S.E.2d 47, 49, *disc. review denied,* 312 N.C. 83, 321 S.E.2d 875 (1984); *North Carolina Nat'l Bank v. Wallens,* 26 N.C. App. 580, 584, 217 S.E.2d 12, 15, *cert. denied*, 288 N.C. 393, 218 S.E.2d 466 (1975) (citing 1 Corbin, Contracts, § 30, pp. 107-8 (1963)).

{34}     A document which merely expresses the intent and desires of the parties rather than their agreement, and which leaves no means to settle the unresolved terms, is not enforceable as a contract. *Chappell v. Roth,* 353 N.C. 690, 692, 548 S.E.2d 499, 500 (2001); *Housing Inc., v. Weaver,* 305 N.C. 428, 444, 290 S.E.2d 642, 652 (1982 ) (finding that a document which failed to specify the form of ownership of the subject project was not enforceable); *Boyce,* 285 N.C. at 734, 208 S.E.2d at 695 ("If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement.") (quoting *Croom v. Goldsboro Lumber Co.,* 182 N.C. 217, 220, 108 S.E. 735, 737 (1921)); *Wallens,* 26 N.C. App. at 584, 217 S.E.2d at 15 ("Generally, a contract, or an offer to contract, which leaves material portions open for future negotiations is nugatory and void for indefiniteness.") (citing *Boyce v. McMahan*, 22 N.C. App. 254, 206 S.E.2d 496, *aff'd* 285 N.C. 730, 208 S.E.2d 692 (1974)).

{35}     Durham points to the case of *Pee Dee Oil* to support its position that a contract with terms left open for future negotiation is not necessarily unenforceable. In *Pee Dee Oil*, the plaintiff, a distributor and retailer of Shell Oil products, accepted a letter proposal sent by the defendant on October 27, 1982, in which defendant promised to pay $215,000 for plaintiff's assets. The writing also contained language indicating that defendant would pay a "reasonable market value" for some additional equipment. *Pee Dee Oil Co. v. Quality Oil Co., Inc.*, 80 N.C. App. 219, 221, 341 S.E.2d 113, 114, *disc. rev. denied*, 317 N.C. 706, 347 S.E.2d 438 (1986).

{36}     Plaintiff's president advised defendant's president that the proposal was accepted, and defendant prepared the asset purchase contract. Defendant submitted the draft contract unsigned to the plaintiff. Defendants ultimately refused to perform under the letter proposal, claiming that it was not a binding contract. The trial court entered directed verdict for the defendants on the breach of contract claim. When the Court of Appeals reversed the trial court, it stated:

> The 27 October 1982 letter, which defendant did sign, can only be

interpreted as an offer to buy the assets referred to except the equipment for $215,000, and to pay the reasonable market value for the equipment; and the evidence tends to show that plaintiff accepted that offer. . . . The defendant's contention that the 27 October letter was too vague to be the basis for a contract because the price of the equipment was not set has no merit. The equipment was but a minor, incidental part of the purchase and contracts do not fail because minor details are left for future determination.

*Id.* at 223, 341 S.E.2d at 115-16.

{37}    During oral argument, Durham and the Defendants in this case agreed that *Boyce* is controlling. This Court agrees. *See, e.g., Housing Inc. v. Weaver,* 305 N.C. at 444, 290 S.E.2d at 652 ("*Boyce . . .* is the definitive decision on agreements to agree."). The acceptance of a proposal to make a future contract, the terms of which are to be subsequently fixed, is not binding. *Boyce,* 22 N.C. App. 254, 206 S.E.2d 496. In *Boyce,* our Court of Appeals made it clear that an agreement "made expressly subject to a future agreement" is not enforceable, even if the parties intended the document to be a final agreement. *Id.* at 258, 206 S.E.2d at 499. By its own terms, the writing in *Boyce* was incomplete and subject to supplementation by a more detailed agreement. Futhermore, "[a]n offer to enter into a contract in the future must, to be binding, specify all the essential and material terms and leave nothing to be agreed upon as a result of future negotiations." *Id.* (quoting *Young v. Sweet*, 266 N.C. 623, 625, 146 S.E. 2d 669 (1966)).

{38}    Other jurisdictions have found language indicating the parties would enter into a "final definitive agreement" to be an important factor in determining whether the parties intended to enter into a binding agreement. *Empro Manufacturing Co., Inc. v. Ball-Co Manufacturing, Inc.,* 870 F.2d 423 (7th Cir. 1989) ("as a matter of law parties who make their pact "subject to" a later definitive agreement have manifested an (objective) intent not to be bound . . . ."); *Knight v. Sharif,* 875 F.2d 516 (5th Cir. 1989) ("The parties' use of the term 'final definitive agreement' also leads to the distinct conclusion that what came before, the letter of intent, was neither final nor definitive."); *Conley v. Whittlesey,* 126 Idaho 630, 888 P.2d 804 (Idaho App. 1995) (holding "agreement in principle" language does not irrevocably commit parties to settlement where parties agreed to memorialize intentions in a formal contract); *Mohrenweiser v. Blomer,* 573 N.W.2d 704 (Minn. Ct. App. 1998) (holding that a letter agreement was unenforceable as a matter of law because it contained phrases showing an intent for future actions and agreements).

{39}    In *Knight*, the parties' letter of intent regarding a stock acquisition indicated that the parties intended to enter into a "final definitive agreement" at a later date. *Knight,* 875 F.2d 516. "The parties' use of the term 'final definitive agreement' also leads to the distinct conclusion that what came

before, the letter of intent, was neither final nor definitive." *Id.* at 524. This language clearly contemplated further negotiations and showed that the parties intended there to be a final definitive agreement before they were to be bound. *Id.* The court further noted that "[c]omplex transactions involving substantial sums are virtually always put into a detailed, formal writing." *Id.* The court in *Knight* commented on the "potential tyranny of the courts in forcing contracts upon parties which they were not willing to make for themselves" by stating:

> Parties that wish to be bound only upon execution of a formal document agree to negotiation in that manner because they wish to create a writing that is satisfactory to both sides in every respect. It is not for the Court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed are so "minor" or "technical" that the contract was binding despite the parties' unwillingness to have it executed and delivered. For the Court to do so would deprive the parties of their right to enter into only the exact contract they desired.

*Id.* at 524 (citation omitted).

{40}  As in *Boyce*, the February 26, 1999 Durham Proposal by its own terms and within its four corners indicates that it is an agreement to agree at a later date. The Durham Proposal expressly states that it is subject to a future, more complete acquisition agreement. Paragraph 9 specifically provides that if the Durham Proposal is accepted, "the parties will enter into a definitive acquisition agreement" at a later date which would include additional terms and resolution of matters left open in the Durham Proposal. It refers to itself internally as a "letter of intent" at least five times, and provides that "[t]his letter of intent, when accepted by the seller, constitutes our good faith agreement in principle to the terms and provisions set forth herein."

{41}  Durham argues that the Durham Proposal lacks language indicating that the parties *do not* intend to be bound by all of its terms until a more formal document is completed and executed. Durham further argues that an earlier draft of Durham's Proposal contained such language, and that language was deleted and replaced with the following: "This letter of intent, when accepted by the seller, constitutes our good faith agreement in principle to the terms and conditions set forth herein." The Court cannot find that the decision to omit language making the agreement non-binding supports a finding that it is a binding contract in direct contradiction of language that actually was included in the final document.

{42}  In addition to references to a future, more definitive agreement, the Durham Proposal contains the following clauses that support the Court's view:

(a.)  The Durham Proposal provided that Durham became obligated to deposit $45,000 in earnest money toward the purchase price and Reidsville became obligated to deposit 7.5% of the purchase

price for indemnification claims only upon "complete execution of the definitive acquisition agreement." (Busick Dep. Ex. 3.)  In other words, there were no mutual obligations until after the definitive acquisition agreement.

(b.)     The Durham Proposal also contained the following "no-shop" clause:

> After the execution of this letter of intent by the seller and prior to April 1, 1999 or any earlier date on which the buyer and seller shall mutually agree in writing to terminate their negotiations hereunder, the seller ... will not negotiate in any capacity with any others for the acquisition of the stock, assets or business of Reidsville . . . . "

A no-shop provision is inconsistent with a definitive agreement.  This provision contemplates additional negotiations between Durham and Reidsville after the execution of the Durham Proposal and, by implication, permits Reidsville to negotiate with other potential buyers besides Durham after April 1, 1999.  No further negotiations with Durham would be necessary, nor would negotiations with other potential buyers be permitted, following the execution of the Durham Proposal if the document were sufficient in and of itself to effect the sale of Reidsville to Durham.[3]

{43}     Not only does the Durham Proposal contain positive language making it non-binding, it also omits material terms and leaves other terms open for future agreement.  As will be discussed below,[4] the Durham Proposal either did not address, or left open for future negotiations, the following material terms:  the form of the acquisition; the manner of payment; lease terms; and representations, warranties, and indemnities.  Durham's subsequent March 22,1999 draft stock purchase agreement addressed many of these issues.  Durham's president, Rand, testified that he was relying on his attorneys "to put together what [was] necessary to make the transaction complete" when Durham mailed the draft stock purchase agreement to Reidsville on March 22, 1999. (Rand Dep. pp 83-84.) This stock purchase agreement was approximately 40 pages long in contrast to the Durham Proposal's length of three pages (not counting signature pages).  Unlike the Durham Proposal, the draft stock purchase agreement included several provisions making Durham's obligation to close conditional on a number of material events, including:

(a)      execution and delivery of the stock purchase agreement by all of Reidsville's shareholders (6.2);

(b)         third parties must grant the necessary consents or other written assurances that the franchise agreements will not be terminated by the sale of stock and grant other consents necessary to avoid default of material contractual arrangements (6.3 and 6.4);

(c)      sellers must have delivered to Durham good standing certificates and an escrow agreement

executed by sellers and an escrow agent (6.5);

(d)     that the warranties and representations of the sellers and officers shall be true in all material respects, as detailed on eleven pages and including among other things sellers' finances, environmental matters, condition of and title to real and personal properties and assets; salaries paid to shareholders; absence of undisclosed liabilities; and employee matters (6.1 and Article III); and

(e)     agreements to a six-page indemnification provision providing for joint and several liability among the sellers, setting forth provisions for making a claim for indemnification, time limits on asserting indemnification claims, dollar limits on liability, and requiring arbitration to resolve such claims (Article VIII).

{44}     The Court of Appeals in *Pee Dee* found that the price of the additional equipment was a minor detail and also noted that the agreement provided that defendant agreed to pay the "reasonable market value" for the equipment. *Pee Dee Oil Co.*, 80 N.C. App. at 221, 341 S.E.2d at 114 . The Durham Proposal's omitted terms and the terms subject to a later agreement are not minor. Furthermore, the Durham Proposal does not provide a mechanism for the Court to determine what the omitted terms should be or how to find out what the parties intended as to these terms.

{45}     Defendants Consolidated and RTCI also contend that if the Durham Proposal is sufficiently definitive, then their prior-in-time Consolidated Proposal is also sufficiently definitive. On February 24, 1999, two days before the Durham Proposal was sent, the holders of 85.4% of Reidsville's outstanding shares and the majority of the Reidsville directors executed the Consolidated Proposal, which set forth the terms upon which Consolidated proposed to acquire Reidsville's assets. Furthermore, the remaining director/shareholder promised to deliver the signed agreement in a matter of days. Pursuant to N.C.G.S. § 55-12-02, a transfer of all or substantially all of a corporation's assets outside the regular course of business need only be recommended by a majority of directors and approved by a majority of shareholders to be valid, with certain exceptions which do not apply here. The Consolidated Proposal (1) specifies the form of the acquisition and describes the assets to be acquired; (2) does not state on its fact that it is subject to a later, more complete acquisition agreement; (3) defines the representations, warranties and indemnification provisions to be included in the transaction rather than attempting to include the "usual and customary" or "typical" provisions; (4) does not leave any term open to "mutual agreement" between the parties; and (5) does not refer to itself with equivocal language such as "letter of intent" or "good faith agreement in principle."

{46}     Durham knew it was in a bidding situation. Durham had submitted a letter to Busick on February 16, 1999 offering $3,340,000. When Durham found out that Consolidated had made a higher offer for

Reidsville and that all of the shareholders except Busick had signed it, Durham submitted a higher bid. At this point, Durham knew that there was a prior existing bid by Consolidated and that Busick was facing internal dissension on the Reidsville Board. The outward manifestations of intent indicate that the parties did not intend for the Durham Proposal to be the final, complete agreement of the parties; the language within the agreement, the behavior of the parties before signing the Durham Proposal, and the behavior of the parties after signing the Durham Proposal all indicate that there was no mutual assent; thus, the Durham Proposal was not a contract. In this situation, the Busicks certainly treated the process as if it were an ongoing bidding process, and each bidder was aware of the other's interest. An auction process would certainly have been preferable to the confusing and misleading process employed by the Busicks.

## IV.

## SPECIFIC PERFORMANCE

{47}    Durham has asked for specific performance of the Durham Proposal. During oral argument, the parties agreed that the subject matter of the agreement was unique. This industry is not a growth industry; the only way to expand is to acquire other bottlers. Thus, cases dealing with land or other kinds of unique subject matter are most appropriate to the resolution of issues in this case. The Court has found that the Durham Proposal is not a valid or enforceable contract. In addition to the issues outlined above, the Durham Proposal omits material terms and leaves many terms open for future negotiation. These terms are material and as such affect the formation of a contract. If this Court had found the Durham Proposal to be a valid or enforceable contract, specific performance would require the Court to enforce an agreement to negotiate in good faith. The Court could not enforce such an agreement.

{48}    "The remedy of specific performance is available to compel a party to do precisely what he ought to have done without being coerced by the court." *Munchak Corp. v. Caldwell,* 301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981) (quoting *McLean v. Keith,* 236 N.C. 59, 71, 72 S.E.2d 44, 53 (1952)). "The party claiming the right to specific performance must show the existence of [1] a valid contract, [2] its terms, and [3] either full performance on his part or that he is ready, willing and able to perform." *Id.* (citing 71 Am. Jur. 2d "Specific Performance" § 207 (1973)). Moreover, specific performance is an equitable remedy that "rests in the sound discretion of the trial court; and is conclusive on appeal absent a showing of a palpable abuse of discretion." *Harborgate Prop. Owners Ass'n., Inc. v. Mountain Lake Shores Develop. Corp.,* 145 N.C. App. 290, 295, 551 S.E.2d 207, 210 (2001) (quoting *Munchak Corp.*, 46 N.C. App. at 418, 265 S.E.2d at 657); *see Boles v. Caudle,* 133

N.C. 528, 45 S.E. 835 (1903) ("The specific performance of a contract in equity is a matter not of absolute right in the party, but of sound discretion in the court."). Because specific performance rests in the Court's discretion, the only role for a jury is to decide any disputed facts. *Boles,* 133 N.C. 528, 45 S.E. 835. In the matter *sub judice*, the undisputed facts are sufficient to allow the Court to rule on the plaintiff's request for specific performance.

{49}    "In rendering a decree of specific performance, the court has no power to decree performance in any other manner than according to the agreement of the parties." *Liang v. Lewis,* 133 N.C. App. 172, 176, 515 S.E.2d 40, 43 (1999) (citing *Lawing v. Jaynes*, 20 N.C. App. 528, 538, 202 S.E.2d 334, 341, *modified on other grounds*, 285 N.C. 418, 206 S.E.2d 162 (1974)); *see also McLean,* 236 N.C. at 71, 72 S.E.2d at 53. Furthermore, "[a] court of equity is not authorized to order the specific performance of a contract which is not certain, definite and clear, and so precise in all of its material terms that neither party can reasonably misunderstand it." *Munchak Corp.,* 46 N.C. App. at 419, 265 S.E.2d at 657 (citations omitted). The court cannot make a new or different contract for the parties, and the court will not imply terms to which the parties did not agree. *McLean,* 236 N.C. at 71, 72 S.E.2d at 53 ("Equity can only compel the performance of a contract in the precise terms agreed on. It cannot make a new or different contract for the parties simply because the one made by the parties proves ineffectual."); *Munchak Corp.,* 46 N.C. App. at 420-21, 265 S.E.2d at 658-59. The remedy of specific performance is not available where there is no mutual obligation to perform. *McLean,* 236 N.C. at 71, 72 S.E.2d at 53.

{50}    Defendants argue that Durham appointed an expert to attempt to quantify monetary damages and thus has an adequate remedy at law and cannot avail itself of specific performance. *See Whalehead Props. v. Coastland Corp.,* 299 N.C. 270, 283, 261 S.E.2d 899, 907-908 (1980). Plaintiff notes that the "mere attempt" to ascertain damages is not sufficient to create a remedy at law. The Court agrees that, without more, the attempt to quantify a party's legal remedy is insufficient to create that remedy.

{51}    With the above principles in mind, the Court turns to the facts in this case. The Durham Proposal omits material terms and leaves some terms open for future negotiations. Durham asserts that these terms are not material and/or they are matters pertaining to the performance of the contract and not to its formation. The Court finds these missing terms are material; thus a contract was not formed. Even if this Court were to find that the absent terms did not affect the contract's formation, their omission from the Durham Proposal would leave the Court in the awkward position of using specific performance to enforce a contract to negotiate in good faith.

{52}     The Durham Proposal provides that Durham arrived at the price of $4.5 million "based upon the following assumptions" and that, "subject to" the assumptions, Durham "desires" to purchase Reidsville.  The Durham Proposal then lists those assumptions.  The Court finds the following "assumptions" to be relevant to the formation of a contract.  The Court further finds that using the terms "subject to," "desires," and "assumptions" in this instance has created conditions precedent to the formation of an enforceable contract. [5]

{53}          **Form of Acquisition and Third-Party Consents.**  The Durham proposal does not specify whether the transaction will be structured as a stock or asset purchase, but instead provides that it may be structured as either one.  The Durham Proposal also noted the possibility that it could be done as an installment sales transaction if Reidsville so desired.  Durham argues that this open term is immaterial and only demonstrates that Durham was willing to proceed no matter what the structure of the deal was.  Durham advised that "although the parties prefer to structure the transaction as an asset purchase, [Durham was] committed to structuring this as a stock purchase transaction if [third-party approvals from The Coca-Cola Company and Consolidated] are not immediately forthcoming."  (Busick Dep. Ex. 9.)

{54}     The form of the acquisition is a material term and leaves several material issues unaddressed.  For instance, an asset sale would leave open the issue of which assets were part of the transaction.  Furthermore, the matter of obtaining the permission of The Coca-Company, Coke USA, and Consolidated under the 1949 Sub-Bottler's agreement would remain unaddressed.[6]  If Reidsville insisted on an asset sale and The Coca-Cola Company or Consolidated refused to grant permission, there would be no deal.  The parties would be back in court litigating whether or not Reidsville's insistence on an asset sale was bad faith.  Even if the parties agreed to a stock purchase, The Coca-Cola Company has indicated that it believes its permission is required whether it is an asset sale or stock purchase agreement.[7]

{55}     The Durham Proposal makes obtaining third party consents a condition precedent to the *formation* of the contract.  Language such as "subject to" can create a condition precedent. In the case of *In the Matter of the Foreclosure of Goforth Properties,* 334 N.C. 369, 375, 432 S.E.2d 855, 859 (1993), our Supreme Court held:

> In general, a condition creates no right or duty but is merely a limiting or modifying factor in a contract. Almost any event may be made a condition. The event may be largely within the control of the obligor or the obligee. Conditions agreed to by the parties are commonly referred to as 'express conditions.' Parties often use language such as 'if,' 'on condition that,'

'provided that,' 'in the event that,' and 'subject to' to make an event a condition, but other words may suffice.

A condition precedent is an event which must occur before a contractual right arises, such as the right to immediate performance. Breach or non-occurrence of a condition prevents the promisee from acquiring a right, or deprives him of one, but subjects him to no liability. The provisions of a contract will not be construed as conditions precedent in the absence of language plainly requiring such construction. The weight of authority is to the effect that the use of such words as 'when,' 'after,' 'as soon as,' and the like, gives clear indication that a promise is not to be performed except upon the happening of a stated event.

*Id.* (internal citations and quotations omitted).

{56} The Durham Proposal plainly states that it is "subject to" a number of events, including, among other things, third-party consents. Until the consents are obtained, there is no mutual obligation to perform. *See McLean v. Keith,* 236 N.C. at 71, 72 S.E.2d at 53. Under similar circumstances, other jurisdictions have found that using language making third party consents a condition precedent does not create an obligation to proceed with the closing until that condition is satisfied by obtaining the consent. *Terradata, Inc. v. Budget Rent-A-Car, Int'l,* 218 F.Supp. 2d 101 (D. P.R. 2002) (finding a letter of intent to purchase a car rental franchise was not a binding contract because the condition precedent of third-party approval was not satisfied); *Langdon v. Sibley,* 100 N.H. 373, 376, 127 A.2d 156, 158 (1956) ("The contention that the provision for consent by Mrs. Colbath was a promise by the defendant to procure her consent, rather than a condition precedent to his obligation to perform cannot be accepted."); *Procedyne Corp. v. Maine Recycle Equipment Corp*., 160 A.D.2d 982, 554 N.Y.S.2d 703 (1990) (finding that a plastic recycler's third-party beneficiary claim was premised on its consent having been a condition precedent to the sublease and license agreement).

{57} To *enforce* this provision, the Court would have to enter an order requiring Reidsville, Durham, Consolidated, The Coca-Cola Company, and Coke USA to negotiate this matter in good faith. The Coca-Cola Company and Coke USA are not before this Court.

{58} **Manner of payment**. The Durham proposal leaves open the manner of payment by providing that "if Reidsville or its shareholders are interested, we are amenable to structuring the deal as an installment sale transaction." The Durham Proposal does not specify the terms of such a potential installment sale.

{59} **Lease Terms**. Our Court of Appeals has held that a lease must specify at least (1) the property to be included in the lease, (2) the terms of the lease, (3) the rental and (4) the time and manner of payment of rent. *Smith v. House of Kenton Corp.,* 23 NC App 439, 209 S.E.2d 397 (1974). The

Durham Proposal provides that "Reidsville will lease the real estate used in the operation of the business to the buyer upon terms which are mutually acceptable to the seller and buyer." It does not provide any method for determining the amount of rent, how long the lease would be, any terms relating to maintenance of the property, or any other term. Plaintiff argues that this was not a contract about a lease and that the property was at best a minor part of the deal; however, Durham did not know if the lease was material or important to Reidsville. (Wellborn Dep. p 87.) The Court notes that the lease was material enough for Durham to condition its obligations to proceed with the purchase of Reidsville's business on the parties' acceptance of mutually agreeable terms on a lease. (Durham Proposal ¶ 4)

{60}    **Representations, Warranties, Indemnities, Etc**. The Durham Proposal provides that upon acceptance of the Durham Proposal, "the parties will enter into a definitive acquisition agreement with the usual and customary representations and warranties (and supporting disclosures), indemnities, covenants and agreements pending closing and other matters typically found in agreements relating to transactions of this type and otherwise satisfactory to the parties." The representations and warranties and the duration of the representations and warranties are material terms to a complex transaction such as the acquisition of stock. *Knight,* 875 F.2d at 524; *see also D.H. Overmyer Co. v. Brown,* 439 F.2d 926, 930 (10th Cir. 1971) (holding that although a letter agreement was clear and unambiguous in requiring indemnification for undisclosed liabilities, the relevant paragraph was "uncertain and indefinite in that it did not specify what warranties, representations, and indemnification" would be appropriate).

{61}    The language in the Durham Proposal leaves representations, warranties, indemnity obligations, and other unspecified transaction terms open for future negotiation. It is clear from the language of the Durham Proposal that the representations and warranties were material in that Durham's obligation to proceed with the purchase was conditioned on Reidsville's making representations and warranties to be specified in the "definitive acquisition agreement." Durham's subsequent behavior, through the March 22, 1999 draft Stock Purchase Agreement, highlighted the materiality of these terms by including over eleven pages of detailed representations and warranties of the seller.

{62}    Durham has not shown that Durham and Reidsville had any mutual understanding as to the meaning of the "usual" or "customary" or "typical" provisions. The Durham Proposal's reference to "usual and customary warranties [and] representations . . . otherwise satisfactory to the parties" is no more definite than the reference to "appropriate warranties [and] representations" contained in *D.H. Overmyer Co.,* 439 F.2d 926. It plainly leaves the specifics of the representations and warranties open

for future negotiations, and the Court cannot fill in the gaps without re-writing the contract for the parties. This is a material omission, and there is no contract.

{63}    Assuming *arguendo* there was a contract, the Court could not enforce it through specific performance. The indemnities provision does not address the scope of the indemnities, including: the circumstances under which the seller and the buyer owe a duty of indemnification to the other; whether the duty to indemnify would be joint and several among the sellers; the procedures for making a claim for indemnification; how claims were to be satisfied; who had the right to choose counsel and make other decisions regarding defense of the claim; who was entitled to settle indemnified claims and whether consent of the other party was necessary to settle claims; how to resolve disputes concerning the duty to indemnify; whether there was to be any cap on the amount of the indemnity; or whether the claims had to exceed a particular amount before a claim for indemnification could be asserted. This Court would be required either to write these provisions for the parties or, contrary to the express provisions of the Durham Proposal and contrary to North Carolina law, eliminate the requirement for indemnities altogether. *Liang,* 133 N.C. App. at 176, 515 S.E.2d at 43 .

## V.

## TORTIOUS INTERFERENCE

{64}    The elements of tortious interference with contract are: (1) a valid contract between plaintiff and a third person which confers upon plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification (5) causing actual damage to the plaintiff. *United Lab v. Kuykendall,* 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) (citing *Childress v. Abeles,* 240 N.C. 67, 84 S.E.2d 176 (1954); *Filmar Racing, Inc. v. Stewart,* 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001). The Court has found that the Durham Proposal is not a valid or enforceable contract; thus, Defendants Consolidated and RTCI cannot be liable for tortious interference with the Durham Proposal.[8]    However, if there were a contract, Defendants Consolidated and RTCI would prevail under the defense of justification.

{65}    "A person is justified in inducing the termination of a contract of a third party if he does so for a reason related to a legitimate business interest." *Fitzgerald v. Wolf,* 40 N.C. App. 197, 200, 252 S.E.2d 523, 524 (1979) (upholding summary judgment in favor of defendant based on justified interference) (citing *Wilson v. McClenny*, 262 N.C. 121, 136 S.E. 2d 569 (1964)). The North Carolina Supreme Court has held that "competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried out in furtherance of one's own interests

and by means that are lawful." *Peoples Security Life Ins. Co. v. Hooks,* 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988) (citing *Childress v. Abeles*, 240 N.C. 667, 84 S.E. 2d 176; 45 Am. Jur. 2d *Interference* §§ 29-32 (1950); Annot. "Interference with Business Relation," 9 A.L.R. 2d 262-63 (1969)). In *Hooks,* our Supreme Court affirmed the dismissal under Rule 12(b)(6) of a plaintiff employer's claim that its former employee had unlawfully interfered with the employment contracts of other employees. The Court focused on whether the defendants' actions constituting the alleged interference were justified. According to the Court, interference is justified, and therefore privileged, if it can be established that the defendant was acting for a "legitimate business purpose" and not merely motivated by a "malicious wish to injure plaintiff." *Id.* at 221, 367 S.E.2d at 650; *see also Childress v. Abeles,* 240 N.C. at 676, 84 S.E.2d at 183 ("If the plaintiff was in competition with the defendants, the defendants would be justified in interfering."); *Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C.,* 2002 NCBC 4 at 49 - 50 (No. 00 CVS 10358, Mecklenburg County Super. Ct. July 10, 2002) (Tennille, J.).

{66}     Because business competition justifies contractual interference, "[w]here the circumstances surrounding a tortious interference claim involve a business competitor, the party asserting the claim must show that the competitor acted with malice or bad motive." *Combs & Assocs., Inc., v. Kennedy,* 147 N.C. App. 362, 372, 555 S.E.2d 634, 641 (1998). Durham has neither alleged nor demonstrated malice or bad motive.

{67}     Deposition testimony by Durham's President and oral argument on this motion indicates that plaintiff believes they are competitors with Consolidated with respect to the acquisition of other bottlers. It is clear that they were competing for the purchase of Reidsville. The undisputed facts in this case show that Consolidated proposed to purchase Reidsville for $4.1 million and after learning of the Consolidated Proposal, Durham proposed to purchase Reidsville for $4.5 million, thereby creating competing "bids" for Reidsville. Consolidated thereafter further increased the purchase price in subsequent proposals, and RTCI eventually acquired Reidsville. The record is devoid of evidence that suggests Consolidated and RTCI were motivated by malice, ill-will, or any motive other than a legitimate business purpose by increasing their bid and proceeding to acquire Reidsville.

## VI.

## UNFAIR TRADE PRACTICES

{68}     The Court next reviews plaintiff's claim that defendants violated North Carolina's Unfair Trade Practices Act, N.C.G.S. § 75-1.1 to –89 (2002). The Act declares unlawful all "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting

commerce . . . ." N.C.G.S. § 75-1.1.

> In order to establish a violation of this section, plaintiff must meet a three-pronged test: (1) there must be a showing of an unfair or deceptive act or practice, or an unfair method of competition; (2) in or affecting commerce; (3) which proximately caused actual injury to the plaintiff.

*Sunbelt Rentals, Inc.,* 2002 NCBC 4 at 67 (internal citations omitted); *see also Dalton v. Camp,* 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). When, as in the present case, the activity of two competing businesses is at issue, the appropriate inquiry is whether there has been a showing of "unfair methods of competition." *Sunbelt Rentals, Inc.,* 2002 NCBC 4 at 67.

In *Sunbelt,* this Court analyzed our unfair trade practices statute, stating:

> The statute itself does not define what conduct constitutes unfair methods of competition. Nor have the North Carolina courts articulated a precise definition, employing a case-by-case approach instead:
>
> > Unfair competition has been referred to in terms of conduct "which a court of equity would consider unfair . . . ." Thus viewed, the fairness or unfairness of particular conduct is not an abstraction to be derived by logic. Rather, the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended actual effects upon others.
>
> *McDonald v. Scarboro,* 91 N.C. App. 13, 18, 370 S.E.2d 680, 684 (1988), quoting *Harrington Manufacturing Co. v. Powell Manufacturing Co.*, 38 N.C. App. 393, 400, 248 S.E.2d 739, 744 (1978), *cert. denied,* 296 N.C. 411, 251 S.E.2d 469, *disc. rev. denied,* 296 N.C. 411, 251 S.E.2d 469 (1979).
>
> The statute was created to provide an additional remedy apart from those less adequate remedies afforded under common law and statutory causes of action. *See Bernard v. Central Carolina Truck Sales,* 68 N.C. App. 228, 314 S.E.2d 582, *cert denied,* 311 N.C. 751, 321 S.E.2d 126 (1984). As a result, our courts have had the opportunity to find that if a party is able to maintain a claim for certain causes of action, a claim may also be had under Section 75-1.1.

*Id.* at 67-69. Tortious interference with contract is one such claim. *See McDonald v. Scarboro*, 91 N.C. App. 13, 19, 370 S.E.2d 680, 684 (1988) ("[A] tortious interference with a contract *could* constitute an unfair method of competition or unfair acts within the meaning of the statute.") (emphasis in original).

{69}     As outlined above, plaintiff's claim for tortious interference of contract does not survive this summary judgment motion. The grounds for granting Defendants Consolidated and RTCI's summary judgment motion were that the Durham Proposal was not a valid or enforceable contract, and in the alternative, defendants had a business justification for interfering. Because these defendants are entitled to summary judgment regarding Durham's tortious interference claim, they are also entitled to

summary judgment on Durham's unfair trade practices claim, which is based on the tortious interference claim. In *Combs & Assocs.*, our Court of Appeals affirmed summary judgment on the plaintiff's tortious interferences claim and several other claims. *Combs & Assocs.,* 147 N.C. App. at 371, 555 S.E.2d at 641. In addressing the plaintiff's unfair trade practices claim, the court concluded:

> Here, plaintiff's claim that defendants engaged in unfair and deceptive trade practices rests with its claims for misappropriation of trade secrets, tortious interference with contracts and civil conspiracy. Having determined that the trial court properly granted summary judgment on each of these claims, we likewise conclude that no claim for unfair and deceptive trade practices exists.

*Id.* at 373, 555 S.E.2d at 641.

{70}     Based on the undisputed facts in this case, the Court finds as a matter of law that Defendants Consolidated and RTCI did not engage in unfair trade practices. The underlying cause of action has not survived summary judgment. The Court does not condone the negotiating techniques of the Reidsville Board and disapproves of the manner in which Mr. Fred Busick conducted himself. However, these actions do not rise to the level of unfair trade practices, especially in a context where Plaintiff Durham was aware of Reidsville's ongoing negotiations with Defendant Consolidated and Busick's manipulation of those negotiations. Defendants Consolidated and RTCI dealt with the Reidsville Board and its designated agent, Overend, in an open and straightforward manner. Both Durham and Consolidated were sophisticated businesses, knowledgeable in the area of mergers and acquisitions of other bottlers.

{71}     The Court GRANTS Defendants Consolidated and RTCI's motion for summary judgment as to the plaintiff's unfair trade practices claim.

## VII.

## BREACH OF CONTRACT

{72}     Having found the Durham Proposal was not a valid or enforceable contract, there can be no breach of that contract. In *Boyce*, the Court held that the parties' preliminary agreement setting forth price and the subject matter to be conveyed was insufficient to support either specific performance *or* damages for breach of contract, as the writing on its face was incomplete and subject to future negotiations. *Boyce,* 285 N.C. at 734, 208 S.E.2d at 695 (emphasis added). For the same reasons that the Individual Defendants and Reidsville are entitled to summary judgment on Durham's claims for specific performance, they are also entitled to summary judgment on Durham's claim for damages for breach of contract.

{73}     The Court GRANTS the Individual Defendants and Reidsville's motion for summary judgment in

this matter.

## VIII.

## CONCLUSION

{74}    The Court finds that Durham's February 26, 1999 letter of intent was not a valid or enforceable contract and consequently GRANTS the defendants' summary judgment motions in all respects and DENIES plaintiff's summary judgment motion.

{75}    As a result of this holding, the Court GRANTS Defendants Consolidated and RTCI's motion to dissolve the preliminary injunction entered in this action against Consolidated and RTCI on July 7, 1999.

{76}    SO ORDERED this the 28th day of April 2003.


Ben F. Tennille
Special Superior Court Judge
 for Complex Business Cases

---

[1] As of February 24, 1999, ownership of Reidsville's shares was broken down as follows:
        Robert S. Fish, T/UW D.D. Busick – 5090 shares (50.9%)
        Fred D. Busick – 1460 shares (14.6%)
        John O. Busick, II – 1260 shares (12.6%)
        William E. Busick –730 shares (7.3%)
        Brona B. Fish – 730 shares (7.3%)
        Kathryn B. McMichael – 730 shares (7.3%)

[2] Busick testified that the Individual Defendants signed the Durham Proposal after signing the Consolidated Proposal because of the "higher amount of money" in the Durham Proposal. (Busick Dep. at 227.) This was especially true for Busick. Durham prepared a valuation of Reidsville dated February 14, 1999. (Busick Dep. Ex. 52.) This valuation reveals that Durham had calculated into its valuation a six-year post-acquisition consulting agreement with Busick that would pay him $558,000, including a $65,000 annual salary plus benefits, a possible country club membership, and a car. No other Reidsville shareholder received a similar offer.

[3] RTCI and Consolidated argue that a due diligence clause in Paragraph 8 of the Durham Proposal indicates that the "clear implication . . . is to allow Durham room to alter or add to the terms of the Durham Proposal in the final acquisition agreement." Provisions such as this one, which condition a party's contractual obligations to perform on an exercise of the party's discretion, are valid. By law, a party must exercise its discretion under such a contractual provision both reasonably and in good faith. *See*, *e.g.*, *Midulla v. Howard A. Cain Co., Inc.*, 133 N.C. App. 306, 309, 515 S.E.2d 244, 246 (1999) ("Where a contract confers on one party a discretionary power affecting the rights of the other, this discretion must be exercised in a reasonable manner based upon good faith and fair play."). The agreement between Durham and Reidsville that Durham have the power to conduct due diligence and related reviews, and to determine whether the results of its investigations are satisfactory, is not only valid but also memorializes what is clearly standard practice for a business purchase transaction of this kind. As a matter of public policy and sound contract law, the Court does not rely on the due diligence clause in reaching its result. A holding to the contrary would destroy most deals where an auction has not occurred.

[4] Although these missing terms go to the formation of a contract, the Court chooses to discuss them under Specific Performance. Doing so highlights that these terms are essential to creating a contract that the Court could enforce. Without the missing terms, the Court cannot give the plaintiff the remedy it seeks – namely, specific performance.

[5] During oral argument, the Court posed the following question to Durham's counsel: "[I]f any one of those assumptions prove to be incorrect, would that alter the purchase price? Or would it give Durham the right not to go forward with the transaction?" Durham answered that the failure of some of those assumptions may have led to an adjustment, but that these failures would go to the closing of the transaction and not to its formation. The Court does not find this argument persuasive.

[6] The Court also addressed third-party approvals above.

[7] Neither The Coca-Cola Company nor Consolidated has given permission for a sale of any sort to Durham. The Coca-Cola Company indicates that it has "reached the conclusion that the acquisition of the Reidsville territory by Consolidated, rather than Durham, would be in the best interests of Coca-Cola, its brands, and of the Coca-Cola system." (Affidavit of William Atchison ¶3.)

[8] Plaintiff has not specifically raised a claim for tortious interference with economic advantage. To state a claim for wrongful interference with economic advantage "the plaintiffs must allege facts to show that the defendants acted without justification in inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference." *Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C.,* 2002 NCBC 4 at 49 (No. 00 CVS 10358, Mecklenburg County Super. Ct. July 10, 2002) (Tennille, J.) (quoting *Cameron v. New Hanover Memorial Hospital,* 58 N.C. App. 414, 440, 293 S.E.2d 901, 917, *disc. rev. denied and appeal dismissed,* 307 N.C. 127, 297 S.E.2d 399 (1982) (internal quotations omitted)). Under this holding, if plaintiff had claimed interference with economic advantage instead of interference with contract, defendants would prevail under a justification defense. *See Id.; Peoples Sec. Ins. Co. v. Hooks,* 322 N.C. 216, 367 S.E.2d 647 (1988).