Sony Ericsson Mobile Commc'ns USA, Inc., v. Agere Sys., Inc., 2007 NCBC 28

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | 06 CVS 17673 |

| | | |
|---|---|---|
| SONY ERICSSON MOBILE COMMUNICATIONS USA, INC., | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | ORDER & OPINION |
| AGERE SYSTEMS, INC., | ) ) | |
| Defendant | ) ) | |

{1}    This civil action arises out of Plaintiff's claims that Defendant, in an effort to conduct and maintain business with Plaintiff, made false or misleading representations and concealed material facts regarding its progress in developing a chip platform for Plaintiff's wireless products; and that Plaintiff suffered substantial damages as a proximate result.  This matter comes before the Court on the Motion to Dismiss for Improper Venue of Defendant Agere Systems, Inc. (the "Motion").

{2}    After considering the briefs, oral arguments, and appropriate matters of record, as discussed herein, the Court GRANTS Defendant's Motion, on the grounds that these parties and this action are subject to an enforceable contractual forum selection clause.

> *Ellis & Winters LLP by Jonathan D. Sasser, Alex Hagan, Thomas H. Segars and Stephen D. Feldman for Plaintiff Sony Ericsson Mobile Communications USA, Inc.*

> *Helms, Mullis & Wicker PLLC by Robert H. Tiller and Julia R. Wicker for Defendant Agere Systems, Inc.*

Jolly, Judge.

# I.

## PROCEDURAL BACKGROUND

{3}    The Plaintiff filed its Complaint in Wake County Superior Court on December 6, 2006 (the "Complaint").  Upon the filing of a Notice of Designation by the Defendant, the case was designated "mandatory complex business" pursuant to section 7A-45.4(b) of the North Carolina General Statutes by Order of the Chief Justice of the Supreme Court of North Carolina dated January 11, 2007.  It was then assigned to the undersigned Special Superior Court Judge for Complex Business Cases by Order of the Chief Special Superior Court Judge for Complex Business Cases dated January 11, 2007.

{4}    Defendant's Motion was filed on February 13, 2007.  The Court heard oral argument on June 28, 2007.

# II.

## THE PARTIES

{5}    Plaintiff Sony Ericsson Mobile Communications USA, Inc. ("Sony USA") is a corporation existing under the laws of Delaware, with its principal place of business in Wake County, North Carolina.  Sony USA is a subsidiary of Sony Ericsson Mobile Communications AB ("Sony AB"), a Swedish corporation jointly owned by Sony Corporation and Telefonaktiebolaget LM Ericsson.

{6}    Defendant Agere Systems, Inc. ("Agere") is a corporation existing under the laws of Delaware, with its principal place of business in Lehigh County, Pennsylvania.

# III.

## AGERE'S MOTION

{7}    Agere moves to dismiss the Complaint pursuant to Rule 12(b)(3) of the North Carolina Rules of Civil Procedure ("Rule 12(b)(3)").  Agere contends that venue lies in New York, rather than North Carolina, pursuant to a contractual forum selection clause in a Master Development and License Agreement (the

"MDLA")[1] Sony AB and Agere entered into on June 27, 2005. (Mem. Law Supp. Mot. 4–5).

{8} The forum selection clause (the "Forum Selection Clause") upon which Agere relies provides:

> The Parties agree to (i) request that any dispute or claim arising out of or in connection with this Master Agreement, or the performance, breach, or termination thereof, be subject to the jurisdiction of the state and federal court located in New York and (ii) to the extent such courts accept jurisdiction, to submit such matters exclusively to such courts. The Parties hereby waive any challenge to the jurisdiction or venue of such courts over these matters.

(MDLA ¶ 27.1.)

## IV.
## APPLICABLE LAW

{9} In addition to the Forum Selection Clause, the MDLA contains a choice of law clause, which provides that the "Master Agreement and any Statement of Work shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles." (MDLA ¶ 27.1.)

{10} Sony USA contends that it is not bound by the MDLA. However, recognizing the potential for an endless analytical loop regarding choice of law, and conceding that the laws of New York and North Carolina relevant to the Defendant's Motion are similar, Sony USA stipulates to the determination of Defendant's Motion under New York law. (Pl.'s Mem. Resp. Mot. 13 n.9.)

## V.
## LEGAL STANDARD

{11} In North Carolina, the proper procedure by which to seek enforcement of a contractual forum selection clause is a motion to dismiss for improper venue

---

[1] The MDLA is attached as Exhibit 2 to the February 13, 2007 Affidavit of Patrick Cadell. The last act necessary to completion of the MDLA was the execution of the document on behalf of Sony AB in Lund, Sweden. (Cadell Aff. Ex. 17, Feb. 13, 2007.)

pursuant to Rule 12(b)(3). *Hickox v. R&G Group Int'l, Inc.*, 161 N.C. App. 510, 511, 588 S.E.2d 566, 567 (2003).[2]

{12} Under New York law, in order to set aside a contractual forum selection clause, which is prima facie valid,

> a party must show that enforcement would be unreasonable and unjust or that the clause is invalid because of fraud or overreaching, such that a trial in the contractual forum would be so gravely difficult and inconvenient that the challenging party would, for all practical purposes, be deprived of [its] day in court.

*British W. Indies Guar. Trust Co. v. Banque Internationale A Luxembourg*, 172 A.D.2d 234, 234 (N.Y. App. Div. 1991).

{13} Further, where a question of the parties' intention regarding an agreement can be determined by reference to the document itself, the question is one of law properly determined by the court. *Mallad Constr. Corp. v. County Fed. Sav. & Loan Ass'n*, 298 N.E.2d 96, 100 (N.Y. 1973); *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract.").

## VI.

## ANALYSIS

{14} Sony USA does not argue that enforcement of the Forum Selection Clause would be unreasonable and unjust. Nor does it argue that the Forum Selection Clause is invalid due to fraud or overreaching such that a trial in New York would deprive it of its day in court. Rather, Sony USA contends that it is not bound by the Forum Selection Clause because either (a) Agere's prior representations in its

---

[2] Upon a motion made pursuant to Rule 12(b)(3), North Carolina courts generally will enforce a contractual forum selection clause in a contract entered outside North Carolina if that clause is mandatory. *Mark Group Int'l, Inc. v. Still*, 151 N.C. App. 565, 568, 566 S.E.2d 160, 162 (2002) ("mandatory forum selection clauses recognized by our appellate courts have contained words such as 'exclusive' or 'sole' or 'only' which indicate that the contracting parties intended to make jurisdiction exclusive"). New York courts similarly look to language indicating the parties' intent to determine whether a forum selection clause is mandatory. *See Price v. Brown Group, Inc.*, 206 A.D.2d 195, 197–201 (N.Y. App. Div. 1994). Here, the Court interprets the Forum Selection Clause to be mandatory.

Notice of Designation bar Agere, under principles of waiver and estoppel, from enforcing the Forum Selection Clause; (b) the MDLA is not an enforceable contract; or (c) even if the MDLA were enforceable, it does not bind Sony USA. (Pl.'s Mem. Resp. Mot.)

## A.
## ESTOPPEL AND WAIVER

{15} Sony USA argues that the doctrines of estoppel and waiver bar Agere from now claiming that this Court is an improper venue for this action after representing to the Chief Justice of the Supreme Court of North Carolina that the Business Court should hear the matter. (Pl.'s Mem. Resp. Mot. 8–12.) In this regard, Sony USA calls attention to Agere's representations made in its Notice of Designation as to why this action should be designated to the Business Court, and to Agere's failure to note that, should the action be so designated, it would contend that this Court is an improper forum for the action.

{16} While Sony USA is correct that Agere's representations in its Notice of Designation should have included all pertinent information so as to enable the Chief Justice to best allocate the limited judicial resources of this State, its arguments regarding estoppel and waiver are unpersuasive for the simple reason that the Business Court is not a court of jurisdiction or venue. Rather, the undersigned sits as a Special Superior Court Judge of the General Court of Justice, with general jurisdiction authority; and when actions are designated or assigned to the Business Court there is no effect on venue, which continues to lie in the county of origin. *See* N.C. Gen. Stat. § 7A-45.4(b).[3] Accordingly, until it filed the Defendant's Motion, Agere had taken no action that would affect the venue of this case.

---

[3] Further, the statute imposes limits on the period of time in which a party such as Agere can seek to have a case designated as "mandatory complex business" and makes no provision for matters such as disputing venue.

{17}   As Agere had neither affected venue nor filed a pleading or Rule 12 motion prior to filing Defendant's Motion, the doctrines of estoppel and waiver do not serve to bar Agere from enforcing the Forum Selection Clause.

B.

THE MDLA IS AN ENFORCEABLE AGREEMENT

{18}   Sony USA argues that the MDLA is an "agreement to agree," the terms of which are unenforceable.  In support of this argument, Sony USA cites to several New York and North Carolina decisions holding that preliminary agreements which leave material terms open or which depend on a later contract are not binding upon the parties.  (Pl.'s Mem. Resp. Mot. 12–20.)  In this regard, Sony USA casts the MDLA in the light of a preliminary agreement with open material terms[4] or a preliminary agreement to negotiate,[5] either of which may be unenforceable as to its terms.

{19}   The MDLA, however, is unlike an agreement with open terms.  Though the MDLA may not contain many of the substantive terms of the contemplated ultimate relationship of the parties itself—which appears to be the provision of technological deliverables[6]—none of its own terms remain to be negotiated.  In this regard, the

---

[4] In a preliminary agreement with open terms the parties typically set out the primary terms of the bargain and agree to be bound by those terms, but leave other terms that will be contained in the final agreement open and undertake to negotiate those terms. 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.8a (3d ed. 2004) (providing that an example of such a preliminary agreement is an "earnest money agreement" utilized in a real estate transaction).  A preliminary agreement with open terms is not necessarily nugatory. *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (stating that such an agreement "binds both sides to their ultimate contractual objective in recognition that contract has been reached, despite the anticipation of further formalities").  However, if such open terms were essential or material, the contract would seemingly fail for indefiniteness. *F & K Supply, Inc., v. Willowbrook Dev. Co.*, 288 A.D.2d 713, 714 (N.Y. App. Div. 2001).

[5] A preliminary agreement to negotiate is similar to a preliminary agreement with open terms in that the parties agree to certain primary terms of the agreement and leave other terms to be negotiated.  It is, however, different from a preliminary agreement with open terms in that the parties do not agree to be bound by any substantive terms, but rather agree to continue to negotiate all terms in good faith.  Accordingly, a party to such an agreement is not bound by the substantive terms of the agreement, although it may be obligated to negotiate. Farnsworth, *supra* note 4.  Such agreement may be enforceable. *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007 (N.Y. 1993) (finding no error in lower court's determination that failure to negotiate "breached an implied covenant of good faith and fair dealing").

[6] *See* MDLA § 1.1.

main purpose of the MDLA is to provide "the general terms and conditions under which" the parties would explore a further relationship. (*See* MDLA ¶ 1.1–1.1.3.) Concordantly, the MDLA does not require that a Statement of Work ever be executed. (MDLA ¶1.)

{20} Further, the MDLA is unlike an agreement to negotiate because none of its terms remain to be negotiated and it indicates the parties' intent to be bound to its substantive provisions.[7] In this regard, the MDLA is more of an "agreement governing negotiations" than an agreement to negotiate. Accordingly, the MDLA is distinguishable from those cases cited by Sony USA.[8]

{21} Conceptually, the MDLA is a "stop-gap" agreement. It is definite on its own terms, looks to the formation of an ultimate agreement, and serves to govern

---

[7] As Sony USA observes, the majority of the MDLA's provisions pertain directly to Statements of Work, should any have been entered. Sony USA argues that this demonstrates that the MDLA's effect depends on a Statement of Work. (Pl.'s Mem. Resp. Mot. 15–17.) However, such dormant provisions neither demonstrate a lack of assent to the MDLA's terms nor otherwise provide grounds upon which to negate those provisions of the MDLA that do not pertain directly to Statements of Work, such as the Forum Selection Clause, (MDLA ¶26 ("If any of one or more of the provisions . . . are for any reason held to be . . . unenforceable . . . , the remaining provisions . . . will remain in full force and effect . . . .")). *See Triple Z Postal Servs. v. United Parcel Servs.*, 2006 WL 3393259, at *8 (N.Y. Sup. Ct. Nov. 24, 2006) (finding that a "severability" clause indicated the parties' intent to avoid the potential use of one contractual clause to defeat another); *Rose v. Materials Co.*, 282 N.C. 643, 658, 194 S.E.2d 521, 532 (1973) ("When a contract contains provisions which are severable from an illegal provision and are in no way dependent upon the enforcement of the illegal provision for their validity, such provisions may be enforced.").

[8] *See Matte v. Zapata Offshore Co.*, 784 F.2d 628 (5th Cir. 1986) (finding that a preliminary agreement that clearly expressed the parties' intent to not be bound to any obligations until the acceptance of a later agreement was not a binding contract); *Page v. Gulf Oil Corp.*, 775 F.2d 1311 (5th Cir. 1985) (finding that a preliminary agreement that was entirely subject to one party's later decision to engage the other was not a binding contract); *Moser v. Aminoil, U.S.A., Inc.*, 618 F. Supp. 774 (W.D. La. 1985) (finding that a master agreement that imposed no obligation on the parties until, if ever, they entered a later agreement was not a binding contract); *Mobil Oil Corp. v. Schlumberger*, 598 So. 2d 1341 (Ala. 1992) (finding that a master agreement that imposed no obligations on the parties until, if ever, they entered a later agreement was not alone a binding contract); *Boyce v. McMahan*, 285 N.C. 730, 208 S.E.2d 692 (1974) (declining to enforce an agreement to agree with open material terms that expressly called for a later agreement); *Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consol.*, 2003 NCBC 3 (N.C. Super. Ct. 2003), http://www.ncbusinesscourt.net/opinions/2003%20NCBC%203.htm (declining to enforce an agreement to agree that contained language indicating a lack of intent to be bound and expressly left its own terms subject to a later agreement); *Joseph Martin, Jr., Delicatessen, Inc., v. Scumacher*, 417 N.E.2d 541 (N.Y. 1981) (declining to enforce an agreement with open material terms as doing so would require the court to determine a term (price) that was material to the agreement); *F & K Supply, Inc.*, 288 A.D.2d 713 (declining to enforce an agreement with open material terms that lacked a severability clause).

the parties' relationship during further negotiations.[9]  That is, while the MDLA acknowledges and contemplates a further contract, in the form of a Statement of Work, none of its own terms depend on the Statement of Work.  Accordingly, a Statement of Work is not necessary to a court's enforcement of the terms of the MDLA.[10]

{22}   The MDLA is an agreement between two sophisticated parties[11] that unequivocally speaks to the parties' intent to be bound.  (MDLA 23 ("Each Party represents that it has caused this Master Agreement to be executed on its behalf by a representative empowered to bind that Party with respect to the undertakings and obligations contained herein.").)  If the intent of Sony AB and Agere was to not be bound by the MDLA, "surely no problem of draftsmanship would have stood in the way of its being spelled out."  *George Backer Mgt. Corp.*, 385 N.E.2d at 1065.  Further, the MDLA appears on its face to be the final form of the agreement.[12]

{23}   As the MDLA is definite and complete as to its own terms, indicates the intent of the parties to be bound, and represents a not-uncommon contract structure in commercial agreements,[13] it constitutes a binding contract as between its signatories, namely Agere and Sony AB.  *See Teachers Ins.*, 670 F. Supp. at 498–

---

[9] A paradigmatic stop-gap agreement is a life insurance "binder."  It typically does not contain the terms of the insurance policy but is definite as to its own terms, binding upon the parties during its effective period, and may merge with the ultimate insurance policy.  Farnsworth, *supra* note 4.  *See generally Springer v. Allstate Life Ins. Co. of N.Y.*, 731 N.E.2d 1106 (N.Y. 2000) (noting that life insurance binder provides interim insurance, usually effective as of the date of application and terminable upon issuance or denial of policy, and may be merged with the policy).

[10]  See for example MDLA ¶¶ 21, 22, 24, 27, & 30.  *Cf. 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 575 N.E.2d 104, 106 (N.Y. 1991) (providing that doctrine of definiteness "means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to"); *Durham Coca-Cola Bottling Co.*, 2003 NCBC 3 (finding that specific enforcement of a contract would require forcing the parties to negotiate, a conclusion that supported not enforcing the contract).

[11] The fairness of the negotiation process may be considered in determining whether a contract is ambiguous.  *George Backer Mgt. Corp. v. Acme Quilting Co.*, 385 N.E.2d 1062, 1065 (N.Y. 1978) (noting that the disputed lease provision was "entered at arm's length and, ultimately on terms . . . which were the residue of suggestions and countersuggestions on which each of the two sophisticated parties had attempted to persuade the other . . . ").

[12] *Cf. Durham Coca-Cola Bottling Co.*, 2003 NCBC 3 ¶ 39 (discussing impropriety of enforcing an agreement that the parties were unwilling to have executed and delivered as doing so would deprive them of their right to enter only the exact contract they desired).

[13] (*See* Pl.'s Mem. Resp. Mot. 17 n.10.)  Also, at the hearing on the Motion, Agere's counsel represented that this structure was a common commercial practice.

507 (laying out factors relevant to determination of whether a preliminary agreement is binding, including expression of intent, the context of the negotiations, the existence of open terms, partial performance, custom in the marketplace and the existence of conditions precedent); *CanWest Global Commc'ns Corp. v. Mirkaei Tikshoret Ltd.*, 804 N.Y.S.2d 549, 568–69 (N.Y. Sup. Ct. 2005) (applying *Teachers Insurance* factors to analysis of whether agreement to negotiate was enforceable).

C.

## THE FORUM SELECTION CLAUSE BINDS SONY USA

{24} Sony USA argues that even if the MDLA binds Sony AB, Sony USA is not a signatory to the MDLA and, therefore, is not bound by the Forum Selection Clause. The plain language of the MDLA indicates otherwise.

{25} Paragraph 1.1.3 of the MDLA defines "Parties" to include Sony AB, Sony AB's "Affiliates," and Agere. Paragraph 2 of the MDLA provides that "Affiliate" means:

> any company or legal entity which is controlled by [Sony AB] but any such company . . . shall be deemed an Affiliate only as long as such control exists and for the purpose of this definition 'control' means direct or indirect ownership of at least fifty per cent (50%) of the voting power of the shares or other securities for election of directors (or other managing authority) of the controlled or commonly controlled entity[.]

{26} Sony USA is "a subsidiary of Sony AB." (Pl.'s Mem. Resp. Mot. 2.) A subsidiary corporation is a corporation in which a parent corporation has a controlling share. *Black's Law Dictionary* 149 (2d pocket ed. 2001). Accordingly, Sony USA is an "Affiliate" of Sony AB as that term is used in the MDLA; and, therefore, Sony USA is encompassed by the term "Parties" as it is used in the MDLA.

{27} Despite Sony USA's argument that Sony AB did not intend to bind all of its affiliates to each of the MDLA's terms,[14] it is clear from the language of the

---

[14] Sony USA argues that, pursuant to prevailing rules of contract construction, the language of the MDLA instructing that the "[t]he contract shall comprise the Statement of Work and the Master Agreement" (MDLA ¶ 3.4) indicates either that the MDLA was not a contract absent a Statement of

MDLA that Sony AB did intend to bind its "Affiliates" to the Forum Selection Clause.  (MDLA ¶ 27.2 ("The <u>Parties</u> agree to" the Forum Selection Clause) (emphasis added).)  Accordingly, Sony USA, which has shown no reason as to why its parent, controlling company would be without power to bind it in contract, is bound by the Forum Selection Clause.

VII.

CONCLUSION

{28}  The Forum Selection Clause is enforceable as between the parties to this civil action.

{29}  Therefore, it hereby is ORDERED that the Motion to Dismiss for Improper Venue of Defendant Agere Systems, Inc. is GRANTED; and this civil action is DISMISSED, without prejudice to the rights of Plaintiff to file its action in a proper forum.

This the 27th day August, 2007.

---

Work or that Sony USA was not to be bound by the MDLA until, if ever, it entered into a Statement of Work.  (Pl.'s Mem. Resp. Mot. 12–22.)  It seems clear, however, that the purpose of Paragraph 3.4, when read in context, was to foresee the situation where the parties would enter into a later contract with which the MDLA could merge.  *See supra* note 9 (example of life insurance binder); *Bailey v. Fish & Neave*, 868 N.E.2d 956 (N.Y. 2007) (stating that where an agreement is set down in a clear, complete document, "such agreements should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases") (opinion in yet-to-be-paginated reporter); *State v. Phillip Morris USA, Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005) ("Intent is derived not from a particular contractual term but from the contract as a whole.").