Gunn v. Laboratory Corp. of Am., 2011 NCBC 35.

STATE OF NORTH CAROLINA

COUNTY OF ALAMANCE

RICHARD W. GUNN, JR. and GUNN
& ASSOCIATES, LLC,

   Plaintiffs,

  v.

SIMPSON, SCHULMAN & BEARD,
LLC; BRET SCHULMAN; RICHARD
BEARD; LABORATORY
CORPORATION OF AMERICA; SN
COMMERCIAL, LLC; SECURITY
NATIONAL MASTER MANAGER,
LLC; SECURITY NATIONAL
PROPERTIES HOLDING COMPANY,
LLC and SEQUOIA INVESTMENTS
XIV, LLC,
JOINTLY AND SEVERALLY,

   Defendants.

IN THE GENERAL COURT OF
JUSTICE
SUPERIOR COURT DIVISION
11 CVS 906

**ORDER**

{1} THIS MATTER is before the Court on Defendant SN Commercial, LLC's Motion to Dismiss for Failure to State a Claim pursuant to North Carolina Rules of Civil Procedure 12(b)(6) ("Motion"). For the reasons stated below, the Motion is GRANTED.

*Vernon, Vernon, Wooten, Brown, Andrews & Garre by E. Lawson Brown, Jr. and Benjamin D. Overby for Plaintiffs Richard W. Gunn, Jr. and Gunn & Associates, LLC.*

*Womble, Carlyle, Sandridge & Rice, PLLC by Michael Montecalvo and Brent F. Powell for Defendant SN Commercial.*

*Parker, Poe, Adams & Bernstein, LLP by William L. Rickard, Jr. and Matthew Hilton Mall for Defendant Laboratory Corporation of America.*

Gale, Judge.

## I. INTRODUCTION

{2} This case arises out of a commercial lease of real property owned and managed by Defendant SN Commercial, LLC ("SNC") and leased by Defendant Laboratory Corporation of America ("LabCorp"). Plaintiffs Richard W. Gunn and Gunn & Associates, LLC (collectively, "Gunn"), a broker and his associated brokerage firm, are not parties to the lease agreement between LabCorp and SNC but contend they were unfairly deprived of a commission by LabCorp, SNC, and Simpson, Schulman, & Beard ("SSB")− a competing broker.[1] Gunn asserts claims against LabCorp for breach of contract, procuring cause, *quantum meruit*, breach of the implied duty of good faith and fair dealing, and violation of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"); and claims against SNC for breach of contract, procuring cause, wrongful interference with a contract, *quantum meruit*, and violation of the NCUDTPA. SNC's Motion seeks dismissal of Gunn's claims.

{3} Gunn's Complaint omits key assertions necessary to state actionable claims, and inferences necessary to provide those elements are inconsistent with the facts alleged. In particular, the Complaint does not allege or support an inference: (1) that a valid contract ever existed between Gunn and SNC; (2) that Gunn ever provided brokerage services at the request of SNC; (3) that SNC induced LabCorp to breach its purported brokerage agreement with Gunn; (4) or that SNC committed acts intended to deceive Gunn. Accordingly, all claims in the Complaint against SNC should be dismissed. Gunn's recovery, if any, should be against LabCorp, the party with whom it allegedly maintained an agency relationship.

---

[1] Although initially named as defendants in this action, Gunn filed a voluntary dismissal pursuant to North Carolina Rules of Civil Procedure 41(a) as to Simpson, Schulman & Beard, LLC, Bret Schulman, and Richard Beard on June 21, 2011. (Voluntary Dismissal Without Prejudice as to Defs. Simpson, Schulman & Beard, LLC, Bret Schulman and Richard Beard.)

## II. PROCEDURAL BACKGROUND

{4} Gunn filed its Complaint in Alamance County Superior Court on April 4, 2011. The matter was designated as a Complex Business Case by Chief Justice Sarah Parker by order dated May 11, 2011 and subsequently assigned to this Court by order dated May 27, 2011. On June 10, 2011, LabCorp filed its Answer and SNC filed its Motion. The Motion has been fully briefed, the Court heard oral arguments on September 7, 2011, the Parties have filed post-hearing briefs, and the matter is ripe for disposition.

## III. STATEMENT OF FACTS

{5} The following facts are taken from the pleadings and construed favorably to the Plaintiffs allowing permissible inferences not inconsistent with the alleged facts.

{6} Richard W. Gunn, Jr. is a citizen and resident of Burlington, Alamance County, North Carolina. Gunn & Associates, LLC is a limited liability company organized under the laws of the State of North Carolina with its principle place of business in Burlington, Alamance County, North Carolina. Richard W. Gunn, Jr. is a real estate broker, licensed in the State of North Carolina and is the broker in charge of Gunn & Associates, LLC. LabCorp is a corporation existing under the laws of the State of Delaware and authorized to transact business in the State of North Carolina, with its principle place of business in Burlington, Alamance County, North Carolina. SNC is a limited liability company that transacts business in the State of North Carolina with its principle place of business in Eureka, California. Plaintiffs and SNC agree that SNC is the appropriate party to the suit and Plaintiffs need not separately include other SNC affiliate companies.

{7} For more than twenty-five (25) years, Gunn has provided real estate brokerage services to LabCorp with respect to the negotiation and execution of lease and purchase agreements, market research and analysis, and opinions of value. (Compl. ¶16; Resp. Br. to Def. SNC Commercial LLC's Mot. to Dismiss ("Resp. Br.") 2.) Over the course of their relationship, LabCorp regularly contacted Gunn when it

had commercial real estate needs and Gunn regularly provided preliminary services to LabCorp at no cost in recognition of their long-standing relationship and under the assumption that if a purchase or lease agreement was ultimately executed, Gunn would be paid a commission.  (Compl. ¶ 17; Resp. Br. 2.)  On numerous occasions, Gunn's efforts resulted in the execution of a purchase or lease agreement, and Gunn was in fact paid a commission.  (Compl. ¶ 18.)

{8} On August 29, 2008, Gunn was contacted by LabCorp agent Gary Aherron ("Aherron") for the purpose of preparing a market search for 30,000 square feet of office space to house a call center.  (Compl. ¶ 19–25.)   The market search was focused on commercial properties with the following characteristics: (1) 675 workstations in an open area; (2) 18-20 offices; (3) 1 to 2 conference rooms; (4) a training room; (5) restrooms; and (6) motor vehicle parking.  (Compl. ¶ 21.)  In response, Gunn prepared and submitted a tour book to LabCorp on September 9, 2008, entitled "Potential Call Center Locations" ("Tour Book"), in which Gunn identified seventeen (17) properties meeting LabCorp's specifications.  (Compl. ¶ 25–26.)  On or about September 10, 2008, Gunn and Aherron met at LabCorp's offices in Burlington, North Carolina to discuss the Tour Book and narrow the search to a list of properties that Aherron and other LabCorp agents would tour.  (Compl. ¶ 27.)  Thereafter, Gunn communicated regularly with Michele Hunter, LabCorp's Administrative Assistant in the Facilities Planning Department, to coordinate LabCorp's visits to a number of properties including the Salem Building.  (Compl. ¶ 28–29.)

{9} On November 14, 2008, Gunn showed multiple properties to LabCorp including properties located in Mebane, North Carolina and the Salem Building in Greensboro, North Carolina.  (Compl. ¶ 28–31.)  Gunn arranged for round-trip van transportation to the properties, scheduled meetings with landlords' agents, and scheduled a lunch with representatives from the Greensboro Economic Alliance, all at no cost to LabCorp in anticipation that LabCorp would sign a lease at one of the properties shown, and arrange for a commission to be paid to Gunn.  (Compl. ¶ 30–33.)

{10} LabCorp continued to encourage Gunn to act as its agent by setting up additional site visits and on November 24, 2008, Aherron and other LabCorp personnel traveled by van to Charlotte, North Carolina to view alternative locations for its call center and meet with the Charlotte Economic Alliance. (Compl. ¶ 41.) On November 25, 2008, Aherron and Gunn traveled to Danville, Virginia to visit other potential call center locations and meet with the Danville Economic Development Alliance. (Resp. Br. 4.)

{11} On December 2, 2008, LabCorp, through Aherron, requested that Gunn obtain a lease proposal for four (4) facilities, including the Salem Building owned by SNC. (Compl. ¶ 42.) On December 10, 2008, Gunn submitted a Request for Proposal of Lease to SNC at the direction of LabCorp, which was mailed to John Kirby at SNC's headquarters in Eureka, California. (Compl. ¶ 44.) On December 11, 2008, Kirby, as agent for SNC, submitted a lease proposal to Gunn indicating that SNC was "interested in pursuing a lease arrangement with [LabCorp] for the Salem Building in Greensboro, NC." (Compl. Ex. B at 1.) The proposal submitted by SNC to Gunn referenced Gunn as the exclusive representative for LabCorp by stating:

> Gunn and Associates is the exclusive representative for the Tenant
> [LabCorp] and will be compensated with a commission fee equal to
> Four Percent (4%) of the overall firm term Gross Rent. Tenant will not
> be responsible for the payment of any commissions. The commission
> must be payable 50% upon lease execution and 50% upon tenant
> occupancy of the premises.

(Compl. ¶ 47; Compl. Ex. B at 6.) The SNC proposal also contained the following disclosure language:

> This letter is not contractually binding on the parties and is only an
> expression of the basic terms and conditions to be incorporated in a
> formal written lease. This letter does not obligate either party to
> negotiate in good faith or to proceed with the completion of a lease. The
> parties shall not be contractually bound unless and until a formal lease
> is executed by the parties, which must be in the form and content
> satisfactory to each party and its counsel in their sole discretion.
> Neither party may rely on this letter as creating any legal obligation of
> any kind. Owner's Manager, Securities National Properties,

represents Landlord/Owner in this transaction, but has no power to obligate or bind the Landlord.  Unless otherwise notified, the values represented in this proposal expire 01/19/2009.

(Compl. Ex. B at 6.)  The SNC proposal did not specify a lease term or commencement date, but provided for four (4) potential lease options with variable pricing.  (Compl. Ex. B.)

{12} On December 18, 2008, Aherron requested that Gunn prepare a Comparative Lease Analysis ("CLA") of the lease proposals Gunn had solicited for LabCorp.  (Compl. ¶ 48.)  On January 5, 2009 Gunn submitted the CLA to LabCorp. (Compl. ¶ 49.)  After reviewing the CLA, Aherron narrowed his focus to the Salem Building and requested that Gunn prepare documented data on the Salem site. (Compl. ¶ 49.)  In response, Gunn prepared the requested information which included economic and demographic characteristics, area crime analysis, utilities capabilities, and workforce analysis.  (Compl. ¶ 50.)

{13} On March 6, 2009, Gunn suggested that LabCorp hire an incentive and negotiation firm to help facilitate the execution of a lease and provided Aherron and LabCorp with contact information for John Krug ("Krug") of Development Advisors, as well as an information packet describing the services Krug provided.  (Compl. ¶ 53–54.)  In response to Gunn's recommendation, LabCorp arranged a meeting between Krug and LabCorp executive officers Mark Schroeder ("Schroeder") and Brad Morton ("Morton").  (Compl. ¶ 55–56.)  The meeting occurred on April 6, 2009. (Compl. ¶ 56.)

{14} Throughout the next five (5) months, Gunn maintained contact with Aherron and Kirby and continued communications related to the proposed lease agreement between LabCorp and SNC.  (Compl. ¶ 57–58.)

{15} On August 5, 2009, Gunn had lunch with Aherron who stated that LabCorp was still interested in the Salem Building, but would not be ready, willing, and able to consummate the lease agreement until the first quarter of 2010. (Compl. ¶ 61.)  Immediately after lunch, Gunn contacted SNC, through Kirby, and communicated LabCorp's continued interest and the date on which LabCorp would

be ready, willing, and able to consummate the lease agreement with SNC. (Compl. ¶ 62.)

{16} On August 24, 2009, LabCorp allegedly executed a purported exclusive real estate broker and tenant agent agreement in favor of SSB. (Compl. ¶ 63.)

{17} Gunn continued to maintain contact with agents of LabCorp and SNC regarding the lease of the Salem Building from August 2009 until the first quarter of 2010. (Compl. ¶ 75–76.)

{18} In October 2009, Kirby communicated to Gunn that SSB was conducting a market search for a call center under the name "Kaleidoscope," prompting Gunn to raise the issue with Aherron. (Compl. ¶¶ 77, 79.) Initially, Aherron indicated that he was unaware of any project under that name but after investigating the matter, Aherron reported to Gunn that "Kaleidoscope" was the exact project for which LabCorp had engaged Gunn. (Compl. ¶ 79–80.) Aherron apologized to Gunn for "Kaleidoscope" and offered to secure the payment to Gunn of seventy-five percent (75%) of any broker commission paid by SNC for LabCorp's leasing of the Salem Building if a lease agreement was eventually executed. (Compl. ¶ 81.) Allegedly, Gunn accepted LabCorp's offer. (Compl. ¶ 82.)

{19} On December 22, 2009, as the first quarter target for the lease execution was approaching, Gunn again met with Aherron who confirmed LabCorp's continued interest in the Salem Building and its continued satisfaction with Gunn as its agent. (Compl. ¶ 83–84.)

{20} During the first quarter of 2010, SSB presented SNC with a purported exclusive representation agreement between SSB and LabCorp. (Compl. ¶ 85.) On January 28, 2010, LabCorp and SNC executed a lease agreement for the Salem Building. (Compl. ¶ 88.) It is alleged that SSB was involved in the negotiation and execution of the LabCorp/SNC lease agreement and that SSB collected a commission of four percent (4%) of the gross value of the initial lease and any expansion of the Salem Building and two percent (2%) on any renewals. (Compl. ¶¶ 94, 103.) Gunn further asserts that LabCorp, SNC, and SSB conspired to prevent

Gunn from collecting a broker commission from the lease of the Salem Building. (Compl. ¶¶ 97, 101–102.)

## IV. STANDARD OF REVIEW

{21} Pursuant to North Carolina Rules of Civil Procuedure 12(b)(6), the appropriate inquiry for a motion to dismiss is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Crouse v. Mineo,* 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008); *Harris v. NCNB Nat'l Bank of N.C.,* 85 N.C. App. 669, 670–71, 355 S.E.2d 838, 840–41 (1987). The Court may also consider documents attached to the Complaint as exhibits and incorporated by reference. *Marzec v. Nye*, 690 S.E.2d. 540 (N.C. Ct. App. 2010). "The complaint is to be liberally construed, and the court should not dismiss the complaint 'unless it appears beyond a doubt that [the] plaintiff could prove no set of facts in support of his claim which would entitle him to relief.'" *Holloman v. Harrelson,* 149 N.C. App. 861, 864, 561 S.E.2d 351, 353 (quoting *Dixon v. Stuart,* 85 N.C. App. 338, 340, 354 S.E.2d 757, 758 (1987)), *disc. review denied,* 355 N.C. 748, 565 S.E.2d 665 (2002).

{22} The Court need not determine that the plaintiff will ultimately prevail in order to deny the motion to dismiss; it need only determine whether plaintiff has adequately pled a claim that allows plaintiff to introduce evidence in support of the claim. *Johnson v. Bollinger*, 86 N.C. App. 1, 4, 354 S.E.2d 378, 381 (1987) (citation omitted). However, dismissal is warranted when the complaint "consist[s] . . . of facts which will necessarily defeat the claim as well as where there is an absence of law or fact necessary to support a claim." *Sutton v. Duke,* 277 N.C. 94, 102–03, 176 S.E.2d 161, 166 (1970). "When considering a motion under Rule 12(b)(6), the court is not required to accept as true any conclusions of law or unwarranted deductions of fact in the complaint." *Branch Banking & Trust Co. v. Lighthouse Fin. Corp.,* 2005 NCBC 3 ¶ 8 (N.C. Super. Ct. July 13, 2005), http://www.ncbusinesscourt.net/opinions/2005%20NCBC%203.htm.

## V. ANALYSIS

### A. Breach of Contract

{23} SNC's Motion asserts that Gunn cannot state a claim against it for breach of contract because the parties never reached an enforceable agreement on the essential terms of any lease between LabCorp and SNC that included payment of a commission to Gunn. (Motion ¶ 1.)

{24} To state a claim for breach of contract, a plaintiff must plead the existence of a valid contract and a breach of the contractual terms. *Poor v. Hill*, 138 N.C. App. 19, 530 S.E.2d 838 (2000). Under North Carolina law, "a real estate broker is entitled to a commission if the broker proves (1) the existence of a binding contract between the broker and the seller and (2) the broker's performance of the contract." *Burge v. First Southern Savings Bank*, 114 N.C. App. 648, 649–50, 442 S.E.2d 552, 553–54 (1994).

{25} In its Complaint, Gunn alleges "Gunn and Gunn & Associates and Security National had an express agreement whereby upon LabCorp entered into a lease agreement with Security National, Security National would pay Gunn and Gunn & Associates a commission equal to four percent (4%) of the gross rent[,]" and that SNC breached its contract with Gunn "by failing to pay Gunn and Gunn & Associates a commission with respect to the execution of a lease agreement with LabCorp and for the Salem Building." (Compl. ¶¶ 114, 116.)

{26} Treated as true, the allegations in paragraphs 114 and 116 of the Complaint state a claim for breach of contract, but under *Sutton*, a dismissal is warranted when, as here, there is an absence of law or fact necessary to support a properly pled claim.

{27} Gunn cannot state a claim against SNC for breach of contract because a valid contract for payment of a commission never existed between Gunn and SNC.

{28} "A document that merely expresses the intent and desires of the parties rather than their agreement, and which leaves no means to settle the unresolved

terms, is not enforceable as a contract." *Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consol.*, 2003 NCBC 3, ¶ 34 (N.C. Super. Ct. Apr. 28, 2003), http://www.ncbusinesscourt.net/opinions/2003%20NCBC%203.htm; *see JDH Capital, LLC v. Flowers*, 2009 NCBC 4, ¶ 29 (N.C. Super. Ct. Mar. 14, 2009), http://www.ncbusinesscourt.net/opinions/2009_NCBC_4.pdf; *see also Crockett Capital Corp. v. Inland Am. Winston Hotels, Inc.*, 2009 NCBC 5 (N.C. Super. Ct. Mar. 13, 2009), http://www.ncbusinesscourt.net/opinions/2009_NCBC_5.pdf. The proposal upon which Gunn bases its breach of contract claim is attached to the Complaint as Exhibit B. The first page of the proposal contains an e-mail from SNC's Kirby to Gunn, dated December 11, 2008, which expresses that the "*proposal* contains the basic terms and conditions upon which Security National Properties ("Landlord"), is *interested in pursuing a lease arrangement* with [LabCorp] for the Salem Building in Greensboro, NC." (Compl. Ex. B at 1–2) (emphasis added.) The proposal does not provide a specified lease term or commencement date, but does provide that

> Gunn and Associates is the exclusive representative for the Tenant [LabCorp] and will be compensated with a commission fee equal to Four Percent (4%) of the overall firm term Gross Rent. Tenant will not be responsible for the payment of any commissions. The commission must be payable 50% upon lease execution and 50% upon tenant occupancy of the premises.

(Compl. Ex. B at 6.)

{29} Following the provision contemplating payment of a commission by SNC to Gunn, the proposal provides an unequivocal disclaimer which states:

> This letter is not contractually binding on the parties and is only an expression of the basic terms and conditions to be incorporated in a formal written lease. This letter does not obligate either party to negotiate in good faith or to proceed with the completion of a lease. The parties shall not be contractually bound unless and until a formal lease is executed by the parties, which must be in the form and content satisfactory to each party and its counsel in their sole discretion. Neither party may rely on this letter as creating any legal obligation of any kind. Owner's Manager, Securities National Properties, represents Landlord/Owner in this transaction, but has no power to

obligate or bind the Landlord.  Unless otherwise notified, the values represented in this proposal expire 01/19/2009.

(Compl. Ex. B at 6.)

{30} Although Gunn's Complaint pleads the conclusion that a valid contract existed between SNC and Gunn for the payment of a commission, this Court finds Gunn's breach of contract claim warrants dismissal because there is an absence of law and fact necessary to support Gunn's conclusion.  The proposal at issue fails as a contract because it is devoid of essential provisions relating to the lease term and the commencement date, and because a plain reading of the document unambiguously establishes that the proposal, by its own terms, is "not contractually binding on the parties," and that the "parties shall not be contractually bound unless and until a formal lease is executed by the parties."  Gunn has neither pled nor alleged the execution of a formal written lease which grants it the contractual right to receive a commission from SNC upon the execution of a lease for the Salem Building.

{31} In sum, Gunn cannot establish the existence of a enforceable contract between Gunn and SNC.  Dismissal of Gunn's breach of contract claim is, therefore, appropriate on the ground that Gunn has failed to state a claim upon which relief may be granted.


B. Procuring Cause

{32} SNC's Motion asserts that Gunn cannot state a claim against it for procuring cause because SNC never engaged Gunn as its real estate broker. (Motion ¶ 2.)

{33} A real estate broker can recover from a lessor or seller of real property under a procuring cause theory only where the lessor or seller has engaged the broker as its agent.  As explained by the North Carolina Supreme Court:

> Ordinarily *a broker with whom an owner's property is listed for sale* becomes entitled to his commission whenever he procures a party who actually contracts for the purchase of the property at a price acceptable to the owner.  If any act of the broker *in pursuance of his authority to*

*find a purchaser* is the initiating act which is the procuring cause of a sale ultimately made by the owner, the owner must pay the commission provided the case is not taken out of the rule by a contract of employment. The broker is the procuring cause if the sale is the direct and proximate result of his efforts and services. The term *procuring cause* refers to "a cause originating or setting in motion a series of events which, without break in their continuity, result in the accomplishment of the prime object *of the employment of the broker*, which may variously be a sale or exchange of the principal's property, an ultimate agreement between the principle and a prospective contracting party, or the procurement of a purchaser who is ready, willing, and able to buy on the principal's terms."

The law does not permit an owner "to reap the benefit of a broker's labor without just reward" *if he has requested a broker to undertake the sale of his property* and *accepts the results of services rendered at his request.*

*Realty Agency, Inc. v. Duckworth & Shelton, Inc.*, 274 N.C. 243, 250–51, 162 S.E.2d 481, 491 (citations omitted) (emphasis added).

{34} In its Complaint, Gunn alleges that "LabCorp had a valid contract of agency with Gunn and Gunn & Associates with respect to their search for leasable commercial real estate." (Compl. ¶ 119.) Pursuant to this agency relationship, LabCorp provided Gunn with specific criteria from which Gunn would identify property suitable to LabCorp's needs. (Compl. ¶ 120.) In response, Gunn located and presented the Salem Building to LabCorp and facilitated negotiations between SNC and LabCorp relating to the lease of the Salem Building. (Compl. ¶ 120–125.) Gunn further alleges that:

Gunn and Gunn & Associates were the originating cause or set in motion a series of events, which, without break in their continuity, resulted in the execution of a lease agreement for the Salem Building between LabCorp and Security National, the prime object for which Gunn and Gunn & Associates were initially contacted by LabCorp.

(Compl. ¶ 130.)

{35} Although Gunn's Complaint plainly alleges that it "set in motion" the series of events which resulted in the execution of a lease between LabCorp and SNC, it fails to allege that it provided brokerage services to or at the request of SNC

or that a valid agency relationship existed between Gunn as a broker and SNC as a seller or lessor or real property.

{36} To the contrary, Gunn's Complaint alleges that it was contacted by LabCorp for the specific purpose of locating leasable commercial real estate that met certain specifications. (Compl. ¶ 119–20.) Gunn repeatedly alleges that it was, at all times relevant, acting as the broker agent for LabCorp and acknowledges that SNC had its own leasing agent, Kirby. (Compl. ¶¶ 33–34, 119.) The Complaint contains a thorough recitation of the brokerage services provided by Gunn at the direction of, and for the exclusive benefit of, LabCorp. Gunn organized and published the Tour Book, organized and financed tours of potential call center locations in Mebane, North Carolina, Charlotte, North Carolina, Greensboro, North Carolina, and Danville, Virginia, conducted a CLA, and set up meetings with property owners, SNC agents, Krug and Development Advisors, and various Economic Development Alliances, all at the request of LabCorp. (Compl. ¶ 19–56.) Gunn's Complaint also reveals that it contacted SNC and Kirby at LabCorp's request rather than contacting LabCorp at the request of SNC. (Compl. ¶ 33.)

{37} In sum, the allegations in Gunn's pleadings fail to state a claim for procuring cause upon which relief may be granted because the Complaint fails to allege that an agency relationship existed between SNC and Gunn with respect to the lease of the Salem Building and the pleadings are devoid of allegations suggesting that Gunn performed any brokerage services at the request of SNC. In light of these deficiencies, the dismissal of Gunn's procuring cause claim is appropriate because the Complaint fails to state a claim upon which relief may be granted.

{38} The Court provided Gunn an opportunity after the hearing to cite any case from any jurisdiction that allowed a claim of procuring cause against a lessor or seller based on an agency relationship existing between the potential lessee or purchaser and its brokerage agent. Gunn reports that a diligent search located no case directly stating an answer to that precise question on either side of the issue.

{39} Certainly, the Court recognizes the unfairness of which Gunn complains. However, the question is to which party those issues must be targeted, and in that regard, the procuring cause claim is appropriately directed at the party with whom a brokerage agreement existed, which is LabCorp, not SNC.

## C. Tortious Interference with a Contract

{40} SNC's Motion asserts that Gunn cannot state a claim against it for tortious interference with a contract because Gunn has not pled or identified any actions that SNC undertook to induce LabCorp to breach its alleged contract with Gunn, and any actions SNC took in entering into a lease with LabCorp were justified and/or privileged. (Motion ¶ 3.)

{41} To state a claim for tortious interference with a contract, a plaintiff must plead "(1) the existence of a valid contract between plaintiff and a third party; (2) knowledge by defendant of the contract; (3) acts by defendant to intentionally induce the third party not to perform the contract; (4) defendant's acts were committed without justification; and (5) actual damage to the plaintiff." *Barker v. Kimberly-Clark Corp.*, 136 N.C. App. 455, 462, 524 S.E.2d 821, 826 (2000).

{42} In an effort to establish a claim for tortious interference against SNC, Gunn's Complaint alleges that "Gunn and Gunn & Associates had a valid agency agreement with LabCorp[,]" "Security National knew about Gunn and Gunn & Associates agreement with LabCorp and acted without justification when deliberately interfering with LabCorp's performance[,]" and "[a]s a direct result of the actions of Security National . . . Plaintiffs were damaged in excess of Ten Thousand Dollars ($10,000.00), the exact amount to be proven at trial." (Compl. ¶¶ 133–34, 138.)

{43} Even taken as true, these allegations are not sufficient to state a claim for tortious interference with a contract. Although Gunn has pled the existence of a contract between Gunn and LabCorp, and SNC's knowledge of that contract, the Complaint does not allege inducement or identify any specific actions undertaken by SNC to induce LabCorp to withhold payment of a commission to Gunn.

{44} It is well settled under North Carolina law that a plaintiff's failure to plead inducement justifies dismissal of a tortious interference claim for failure to state a claim upon which relief may be granted. *See Holleman v. Aiken*, 193 N.C. App. 484, 500, 668 S.E.2d 579, 590 (2008) (affirming trial court's dismissal of tortious interference claim due to plaintiff's failure to establish enforceable contract with third party and plaintiff's failure to plead inducement).

{45} Gunn's tortious interference claim also fails because the pleadings do not support the conclusory allegation that SNC acted "without justification in deliberately interfering with LabCorp's performance." (Compl. ¶ 134.)

{46} To establish a lack of justification, "[a] complainant must show that the defendant acted with malice and for a reason not reasonably related to the protection of a legitimate business interest of the defending party." *Sellers v. Morton*, 191 N.C. App. 75, 82, 661 S.E.2d 915, 921 (2008). Here, Gunn has not alleged any facts to support an inference that SNC acted with malice or without justification in its dealings with Gunn or LabCorp. The pleadings likewise do not allege that SNC acted in a manner unrelated to its legitimate business interest in negotiating and securing LabCorp's lease of the Salem Building.

{47} Accordingly, the Complaint fails to state a claim for tortious interference with a contract because Gunn has failed to allege inducement and failed to plead facts necessary to support an inference that SNC acted without justification in securing LabCorp's tenancy in the Salem Building. As a result of these deficiencies, the dismissal of Gunn's tortious interference with a contract claim is appropriate because the Complaint fails to state a claim upon which relief may be granted.

D. *Quantum Meruit*

{48} SNC's Motion asserts that Gunn cannot state a claim against it for *quantum meruit* because SNC never requested that Gunn assist it in locating prospective tenants, and Gunn has not pled or identified any services that it provided to SNC. (Motion ¶ 4.)

{49} To state a claim for *quantum meruit*, a plaintiff must allege that "(1) services were rendered to defendants; (2) the services were knowingly and voluntarily accepted; and (3) the services were not given gratuitously." *Environmental Landscape Design Specialist v. Shields*, 75 N.C. App. 304, 306, 330 S.E.2d 627, 628 (1985).

{50} In support if its claim for *quantum meruit*, Gunn's pleadings allege "[p]laintiffs provided Security National with brokerage services[,]" "Security National acquiesced in the provision of brokerage services by the Plaintiffs[,]" and that "Security National was aware that Plaintiffs expected to be compensated for the provision of brokerage services." (Compl. ¶ 146–48.) In its brief, Gunn asserts that its *quantum meruit* claim should withstand the Motion because "the complaint specifically alleges that Plaintiffs brought LabCorp to SN Commercial" and "the complaint specifically alleges that a deal was ultimately completed based on the work of Plaintiffs." (Resp. Br. 11.) Thus, the *quantum meruit* claim recasts the facts upon which the procuring cause claim is premised.

{51} Taken as true, the pleadings are sufficient to state a claim for *quantum meruit*, but this Court finds that the facts alleged do not support the inference that Gunn undertook to provide any brokerage services to SNC as opposed to LabCorp.

{52} Gunn alleges, on one hand, that it "provided Security National with brokerage services," while on the other hand repeatedly alleging that "Security National knew or should have known that Gunn and Gunn & Associates were agents of LabCorp." (Compl. ¶¶ 36, 37, 119, 133.) Gunn describes its agency relationship as "a course of dealing" for "not less than 25 years" in "the brokering of real estate purchases and real estate leases with LabCorp." (Compl. ¶¶ 15, 16, 104.) This agency relationship resulted in the "common basis of understanding that Gunn and Gunn & Associates would provide initial services to LabCorp with the expectation that upon the signing of a lease or the rendering of a sale, Gunn and Gunn & Associates would be paid a commission." (Compl. ¶ 106.) Pursuant to this common understanding, and on numerous occasions, Gunn "performed for LabCorp by providing brokerage services and LabCorp performed by paying a commission."

(Compl. ¶ 107.) Gunn does not allege a similar course of dealings with SNC or provide any factual allegations to support an inference that Gunn maintained a similar agency relationship with SNC for the provision of brokerage services.

{53} The Complaint is saturated with allegations describing the brokerage services Gunn provided to LabCorp at LabCorp's request, but does not contain a single paragraph describing services rendered to SNC except as incidental to services it provided to LabCorp. Gunn alleges that it was "contacted by Aherron, on behalf of LabCorp, for the purpose of preparing a market search for 30,000 square feet of office space[;]" that it "was acting as an express agent for LabCorp in its search for a particular type of commercial real estate and in a particular region[;]" that it "performed a market search and submitted multiple bound copies of a tour book to LabCorp[;]" that it obtained lease proposals from prospective landlords; that it facilitated and financed site visits to potential call center locations in North Carolina and Virginia; and that it set up meetings with agents, landlords, incentive and negotiation firms, and various Economic Development Alliances, all at the request of LabCorp. (Compl. ¶¶ 19, 25, 28–32, 42–45.) By its own admission, "[t]he services described above were provided by Gunn and Gunn & Associates to LabCorp in anticipation that LabCorp would ultimately sign a lease at one of the facilities shown, resulting in a commission for Gunn and Gunn & Associates, which was consistent with the sequence of previous conduct between the parties." (Compl. ¶ 33.) Gunn even alleges that it initiated contact with SNC and Kirby regarding the Salem Building "pursuant to Gunn and Gun (sic) & Associates' role as agents for LabCorp it their search for a call center." (Compl. ¶ 34.)

{54} With respect to SNC, Gunn acknowledges that "at all times relevant to this action, Mr. John Kirby ("Kirby") acted as agent for Security National." (Compl. ¶ 12.) The Complaint alleges "Kirby and Gunn and Gunn & Associates had not less than 20 email (sic) and other communications relating to LabCorp's continued interest in leasing the Salem Building" "between November 14, 2008 and the first quarter of 2010[;]" and that it requested a lease proposal from SNC during December 2008. (Compl. ¶¶ 35, 44.)

{55} The Court finds that the allegations in the Complaint do not support an inference that Gunn rendered brokerage services to SNC in connection with LabCorp's ultimate lease of the Salem Building. The allegations concerning the Gunn and SNC are suggestive of an arms-length business relationship and not an agency relationship for the provision of brokerage services. The fact that SNC engaged in negotiations with Gunn concerning the Salem Building does not the alter the analysis. It can hardly be said that by responding to Gunn's request for a lease proposal, SNC acquiesced to the creation of a brokerage relationship and agreed to become liable for a commission upon the execution of a lease covering the Salem Building.

{56} The allegations in the Complaint do not support an inference that Gunn rendered brokerage services to SNC. Consequently, the dismissal of Gunn's *quantum meruit* claim is appropriate because the Complaint fails to state a claim upon which relief could be granted.

### E. Unfair and Deceptive Trade Practices

{57} SNC's Motion asserts that Gunn cannot state a clam against it for violation of the NCUDTPA because Gunn has not pled or identified any substantial aggravating factors that accompanied SNC's alleged breach of contract, and Gunn has not specifically pled or identified any deceptive actions undertaken by SNC. (Motion ¶ 5.)

{58} To state a claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1, the plaintiff must allege: (1) an unfair or deceptive act or practice; (2) affecting commerce; and (3) which proximately causes actual injury. *Poor*, 138 N.C. App. at 27, 530 S.E.2d at 844; *see also, Strickland v. Lawrence*, 176 N.C. App. 656, 665, 627 S.E.2d 301, 307 (2006). "[A] practice is unfair when it offends established public policy" and "when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers*." Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 139 N.C. App. 360, 367, 533 S.E.2d 827, 832 (2000) (quoting *Warfield v. Hicks,* 91 N.C. App. 1, 8, 370 S.E.2d 689, 693, *disc. review*

*denied,* 323 N.C. 629, 374 S.E.2d 602 (1988)) (citations omitted). "The fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others." *McDonald v. Scarboro*, 91 N.C. App. 13, 18, 370 S.E.2d 680, 684 (1988). For a practice to be deceptive, it must "possess the tendency or capacity to mislead." *Forsyth Mem'l Hosp. v. Contreras*, 107 N.C. App. 611, 614, 421 S.E.2d 167, 170 (1992). Whether a particular commercial act or practice constitutes an unfair or deceptive trade practice is a question of law. *Norman Owen Trucking, Inc. v. Morkoski,* 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (1998); *see First Union Nat'l Bank v. Brown,* 166 N.C. App. 519, 603 S.E.2d 808, 819 (2004).

{59} "It is well recognized . . . that actions for unfair or deceptive trade practices are distinct from actions for breach of contract, and that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [N.C. Gen. Stat. § 75-1.1]." *Eastover Ridge, L.L.C.,* 139 N.C. App. at 367, 533 S.E.2d at 832; *Branch Banking and Trust Co. v. Thompson,* 107 N.C. App. 53, 62, 418 S.E.2d 694, 700, *disc. review denied,* 332 N.C. 482, 421 S.E.2d 350 (1992) (citations omitted). To become an unfair trade practice, the breach of contract must be "characterized by some type of egregious or aggravating circumstance." *Norman Owen Trucking, Inc.*, 131 N.C. App. at 177, 506 S.E.2d at 273. It is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 347 (4th Cir. 1998) (citing *Strum v. Exxon Co.*, 15 F.3d 327, 333 (4th Cir. 1994)).

{60} In support of its unfair and deceptive trade practices claim, Gunn alleges "[u]pon information and belief, Security National knowingly and intentionally made false and misleading statements, which were intended to be relied upon, denying its association, communication, and interaction with Gunn and Gunn & Associates relating to the Salem Building[;]" "[t]he Defendants engaged in conduct constituting unfair and deceptive trade practices[;]" "[t]he Defendants engaged in conduct

constituting unfair methods of competition[;]" and "[t]he Defendants actions were in or affecting commerce." (Compl. ¶¶ 89, 155–57.)

{61} Although Gunn's Complaint accurately recites the elements of a claim for unfair and deceptive trade practices in conclusory fashion, the bald allegations in paragraph 89 are not sufficient to support an inference that "some type of egregious or aggravating circumstances" accompanied SNC's alleged breach of contract. While Gunn has pled, upon information and belief, that SNC "knowingly and intentionally made false and misleading statements, which were intended to be relied upon," it does not provide any factual support for such conclusory allegations. (Compl. ¶ 89.) Gunn fails to identify the substance of the communication, the speaker and the target of the statements, or any specific facts relating to the circumstances of the alleged "false and misleading statements."

{62} In the absence of specific allegations necessary to support an inference of egregious or aggravating circumstances, the underlying basis of Gunn's unfair and deceptive trade practice claim is SNC's alleged breach of contract. As the Fourth Circuit has explained, "claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement are relegated to the arena of contract law" and are not properly addressed as unfair and deceptive trade practice claims. *Broussard*, 155 F.3d 331.

{63} Accordingly, this Court finds that the Complaint fails to state a claim for unfair and deceptive trade practices because Gunn has failed to allege the type of egregious or aggravating circumstances necessary to support an independent *sui generis* claim. In the absence of such allegations, Gunn's Complaint cannot provide the basis for a statutory claim under the NCUDTPA. Gunn's claim for unfair and deceptive trade practices, therefore, should be dismissed for failure to state a claim upon which relief could be granted.

## VI. CONCLUSION

{64} For the reasons stated, Defendant SNC Commercial, LLC's Motion to Dismiss for Failure to State a Claim is GRANTED and the Complaint as to that Defendant is DISMISSED.

IT IS SO ORDERED, this 23rd day of September, 2011.